Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133
publicdefense@gmail.com

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES<br><br>        Plaintiff,<br><br>vs.<br><br>CHRISTOPHER SAVAGE, Kootenai National Forest Supervisor, FAYE KRUEGER, Regional Forester of Region One of the U.S. Forest Service, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, and UNITED STATE FISH & WILDLIFE SERVICE, an agency of the U.S. Department of the Interior,<br><br>        Defendants. | CV-<br><br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

# I. INTRODUCTION

1.      This is a civil action for judicial review under the citizen suit provision of the
Endangered Species Act and the Administrative Procedure Act of the U.S.
Forest Service's (Forest Service) and U.S. Fish and Wildlife Service's (FWS)
authorizations, analyses, and lack thereof for the East Reservoir Project
(Project) on the Kootenai National Forest (Forest), and amendments to the
Kootenai National Forest Land and Resource Management Plan (Forest Plan),
including authorizations and analyses of site-specific forest plan amendments
exempting the Project logging from logging restrictions, as well as the
Northern Rockies Lynx Management Direction (Lynx Amendment).

2.      Plaintiff Alliance for the Wild Rockies attests that the decisions approving the
challenged authorizations and analyses are arbitrary and capricious, an abuse
of discretion, and/or otherwise not in accordance with law.

3.      Defendants' actions or omissions violate the National Environmental Policy
Act (NEPA), 42 U.S.C. 4331 *et seq.*, the National Forest Management Act
(NFMA), 16 U.S.C. § 1600 *et seq.*, the Endangered Species Act (ESA), 16
U.S.C. § 1531 *et seq*,  and the Administrative Procedure Act (APA), 5 U.S.C.
§§ 701 *et seq.*

4.      Plaintiff requests that the Court set aside the Project decision pursuant to 5
U.S.C. § 706(2)(A) and 16 U.S.C. § 1540(g) and enjoin implementation of

the Project.

5.      Plaintiff seeks a declaratory judgment, injunctive relief, the award of costs

and expenses of suit, including attorney and expert witness fees pursuant to

the Equal Access to Justice Act, 28 U.S.C. § 2412, and the Endangered

Species Act, 16 U.S.C. § 1540(g)(4), and such other relief as this Court

deems just and proper.

## II. JURISDICTION

6.      This action arises under the laws of the United States and involves the United

States as a Defendant. Therefore, this Court has subject matter jurisdiction

over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331,

1346.

7.      An actual controversy exists between Plaintiff and Defendants.  Plaintiff's

members use and enjoy the Kootenai National Forest for hiking, fishing,

hunting, camping, photographing scenery and wildlife, and engaging in other

vocational, scientific, spiritual, and recreational activities. Plaintiff's members

intend to continue to use and enjoy the area frequently and on an ongoing

basis in the future.

8.      The aesthetic, recreational, scientific, spiritual, and educational interests of

Plaintiff's members have been and will be adversely affected and irreparably

injured if Defendants implement the Project.  These are actual, concrete

injuries caused by Defendants' failure to comply with mandatory duties under NFMA, NEPA, ESA, and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiff's requested relief under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 & 706.

9.   Plaintiff sent a notice of intent to sue under the ESA on December 2, 2014. Thus, Plaintiff has complied with the 60 day notice requirement for claims under the ESA and this Court has jurisdiction to review Plaintiff's ESA claims.

10.   Plaintiff submitted timely written comments and an objection concerning the Project in the available administrative review process, thus it has exhausted administrative remedies. Defendant's Record of Decision was the final administrative action of the U.S. Department of Agriculture Forest Service. Thus, the Court has jurisdiction to review Plaintiff's APA claims.

## III. VENUE

11.   Venue in this case is proper under 28 U.S.C. § 1391(e) and LR 3.3(a)(1). Defendants Savage and Krueger both reside within the Missoula Division of the United States District Court for the District of Montana.

## IV. PARTIES

12.   Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the

native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems. Its registered office is located in Missoula, Montana. The Alliance has over 2,000 individual members, many of whom are located in Montana. Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area in the Kootenai National Forest. Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems by approving the challenged Project and Forest Plan. Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

13. Defendant CHRISTOPHER SAVAGE is the Kootenai National Forest Supervisor, and in that capacity is charged with ensuring that decisions made on the Kootenai National Forest are consistent with applicable laws, regulations, and official policies and procedures.

14. Defendant FAYE KRUEGER is the Regional Forester for the Northern Region/Region One of the U.S. Forest Service, and in that capacity is charged with ultimate responsibility for ensuring that decisions made at each National Forest in the Northern Region, including the Kootenai National Forest, are

consistent with applicable laws, regulations, and official policies and procedures.

15.     Defendant UNITED STATES FOREST SERVICE (Forest Service) is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of our National Forests, including the Kootenai National Forest.

16.     Defendant UNITED STATE FISH AND WILDLIFE SERVICE is an administrative agency within the U.S. Department of Interior and is responsible for lawful management of species listed under the Endangered Species Act.

## V.  FACTUAL ALLEGATIONS

17.     Defendant Savage signed the Record of Decision authorizing the Project on October 27, 2014.

18.     The agency chose to implement Alternative 2 from the draft EIS with modifications.

PROJECT AREA

19.     The Project area is approximately 15 miles east of Libby, Montana in Lincoln County, along the east side of Lake Koocanusa Reservoir.

20.     The Project area is approximately 92,407 acres. The Forest Service manages 78,546 acres, Montana State Department of Natural Resources and

Conservation manages 4,032 acres, 1,322 acres are in private ownership, Plum Creek Timber Company owns 7,672 acres, and the Corp of Engineers manages 802 acres.

21. The Project area consists of five major drainages: Fivemile Creek, Warland Creek, Cripple Horse Creek, Canyon Creek, and Dunn Creek. These drainages flow from east to west.

22. The Project area is heavily roaded from past management actions: the road density in Dunn Creek is 3.6 miles/square mile; the road density in Canyon Creek is 2.9 miles/square mile; the road density in Cripple Horse Creek is 2.8 miles/square mile; the road density in Warland Creek is 2.7 miles/square mile; and the road density in Fivemile Creek is 2.5 miles/square mile.

23. The Project area has also been heavily logged: commercial logging has occurred on 43,673 acres, including over 22,000 acres of clear-cutting. This amounts to 47% of the Project area.

24. Existing actual old growth habitat in the Project area is far below historic range at 1,203 acres, roughly 1% of the Project area.

25. Additionally, almost half of all of the stands of both actual old growth and "replacement" old growth in the Project area (47%) are smaller than 50 acres. The Forest Plan states that "[i]solated blocks of old growth which are less than 50 acres and surrounded by young stands contribute very little to the

long-term maintenance of most old growth dependent wildlife species."

26. Within existing designated actual or replacement old growth, there are approximately 30 miles of roads that either bisect or are adjacent to stands.

27. There are also 136 areas where existing clearcut or modified clearcut units are adjacent to actual or replacement old growth. The edge effects of these units degrade about 1,744 acres of actual old growth or replacement old growth.

28. In part as a result of past timber harvest, Cripple Horse Creek is currently impaired for aquatic life support and cold-water fisheries due to siltation.

PROJECT & IMPACTS/ANALYSIS

29. The Project authorizes commercial logging on 8,845 acres, including clear-cutting or modified clear-cutting on 3,458 acres.

30. The Project authorizes nine clearcuts or modified clearcuts that will exceed the Forest Plan's 40 acre limitation.

31. The Project authorizes precommercial thinning on 5,775 acres.

32. The Project authorizes burning on 4,257 acres.

33. The Project authorizes reconstruction and maintenance of 176.40 miles of logging roads for Project operations.

34. The Project authorizes the construction of 9.25 miles of new permanent roads.

35.     The Project authorizes the construction of 4.26 miles of new temporary

        logging roads, which will be obliterated after logging.

36.     The Project authorizes the opening of 1.79 miles of previously restricted

        roads.

37.     The Project allows the opening of approximately 9.5 miles of Trails # 281

        and 420 to motorized trail use.  These trails were closed to motorized use in

        previous NEPA documents.

38.     The Project authorizes the decommissioning of 5.93 miles of existing

        National Forest system roads.

39.     The Project authorizes a change to "intermittent stored service" for 16 miles

        of roads.

40.     During the analysis and preparation for the Project, the agency changed 27.71

        miles of decommissioned roads into existing road status.

41.     By changing the decommissioned roads to stored as an existing condition,

        total road density increases.

42.     The Project also authorizes the addition of 13 miles of "undetermined" roads

        into the National Forest road system.

43.     The Project authorizes the decommissioning of 6.24 miles of "undetermined"

        roads.

44.     The Forest uses the term "undetermined" roads to refer to roads that are

"unauthorized roads."

45.     Undetermined roads are "not officially part of the National Forest system."

46.     The Project will increase open road density in Management Areas 15-18 from 68.3 miles of open road to 70.0 miles of open road.

47.     The Project will increase total road density in the Project area by 44.03 miles of total National Forest system roads:  9.25 miles of new roads, plus 27.71 miles of existing roads that were previously decommissioned, plus 13 miles of undetermined roads, less 5.93 miles of roads to be decommissioned.

48.     The Project authorizes the construction of roads adjacent to or through old growth stands, and authorizes additional clearcutting or modified clearcutting next to old growth stands.

49.     The Project authorizes the degradation of 250 acres of existing old growth stands via edge effect.

50.     The Forest Service estimates that Project logging will be completed by 2019; and precommercial thinning will be completed by 2025.

51.     The Project is "financially inefficient" and will result in a net loss to the Forest Service, and the federal taxpayer, of $2,589,535.00.

GRIZZLY BEAR

52.     The grizzly bear is an ESA-listed threatened species that is present on the Forest.

53.     Grizzly bears may be present in the Project area.

54.     The Forest Service included grizzly bears in the biological assessment for the
        Project.

55.     Defendants assert that the Project "may affect, but is not likely to adversely
        affect" the threatened grizzly bear.

56.     The Tobacco Bears Outside Recovery Zone (BORZ) is partially within the
        Project Area:  18,428 acres of the Project area is within the Tobacco BORZ.

57.     Within the Tobacco BORZ, the Project will decommission 0.65 miles of
        existing authorized Forest Service system roads, which include segments of
        one restricted road, several open roads, and a road for private access.

58.     Within the Tobacco BORZ, the  Project will also decommission 1.84 miles of
        "undetermined" roads.

59.     Within the Tobacco BORZ, the Project will construct 2.22 miles of new
        permanent roads, which will be restricted roads that do not allow public
        access.

60.     Within the Tobacco BORZ, the Project will authorize and permanently add
        2.6 miles of "undetermined" roads to the National Forest system.

61.     Within the Tobacco BORZ, the Project will also construct 0.67 miles of
        temporary roads that will be decommissioned after Project implementation.

62.     Within the Tobacco BORZ, the Project will change the restriction status on

7.9 miles of roads to "intermittent stored service" status, which is a category that still contributes to miles of total linear roads.

63. In sum, post-Project, within the BORZ, the Project will permanently change the existing authorized National Forest road system by adding 2.22 miles of new roads and 2.6 miles of undetermined roads, and decommissioning 0.67 miles of existing system roads for a net increase of 4.15 miles of new permanent roads added to the National Forest road system in the Tobacco BORZ.

64. Across the entire Forest, the Forest Service has increased total miles of roads from 6,200 miles of road in 1987 to 7,886 miles of road in 2008, an increase of 1,686 miles.

65. The Forest Service concedes that the existing condition of the Tobacco BORZ is already having adverse effects on grizzly bears.

66. In addition, during timber harvesting, grizzly bears may be displaced from 10,742 acres of their habitat.

67. During log-hauling, grizzly bears may be displaced from 8,000 acres of habitat.

68. During helicopter burning activities, grizzly bears may be displaced from 5,000 to 25,000 acres.

69. The Project will reduce vegetative cover for grizzly bears by 1,583 acres.

70.     The large clearcuts authorized by the Project that are located on open roads

        may increase the risk of grizzly bear mortality by providing would be

        poachers longer and/or wider sight distances in which to shoot a bear for

        approximately 10 to 15 years until hiding cover has been re-established.

71.     The Project may displace grizzly bears into areas not affected by the

        activities.

LYNX

72.     The Canada lynx is an ESA-listed threatened species that is present on the

        Forest.

73.     Canada lynx have designated critical habitat on the Forest.

74.     Canada lynx may be present in the Project area and lynx critical habitat is

        present in the Project area.

75.     The Forest Service included lynx in the biological assessment for the Project.

76.     Defendants assert that the Project "may affect, but is not likely to adversely

        affect" the threatened Canada lynx and lynx critical habitat.

77.     The Project is within the Cripple "Lynx Analysis Unit" (LAU) and within

        Northern Rocky Mountains lynx critical habitat unit #3.

78.     Cripple LAU has 55,798 acres of lynx habitat.

79.     Within lynx critical habitat, the Project allows commercial logging of 1,269

        acres of mature lynx habitat, precommercial thinning of 212 acres of

snowshoe hare habitat, and precommercial thinning of 3,564 acres of lynx matrix habitat, for a total of 5,045 acres of lynx critical habitat.

80. The Project will clearcut 1,269 acres of mature lynx habitat, which will increase the amount of unsuitable winter snowshoe hare habitat from 4.0% to 8.3%, and increase the percentage of clearcuts or modified clearcuts on lynx habitat from 1.7% to 5.8%.

81. The Project will additionally precommercial thin and render unsuitable 212 acres of snowshoe hare habitat, under one of the exceptions to Lynx Amendment Standard VEG S5, which allows daylight thinning around planted rust-resistant white pine.

82. The Project clearcuts will result in openings that would likely impede the foraging behavior of hare and lynx for at least 10 years (summer foraging) to 30 years (winter foraging).

83. The Project will remove 14 areas of movement corridors.

WILDLIFE SECURITY & MOTORIZED TRAILS

84. Elk and grizzly bears are both management indicator species on the Forest and are present within the Project area.

85. Elk and grizzly bears are both sensitive to road density and require secure habitat or security areas that are free from roads.

86. The EIS for the Project represents that there are approximately 36.5 miles of

open motorized trail in the Project area:  Trails # 279, 280, 281, 420, 426, and 500.

87.  The EIS for the Project represents that the Project would close approximately 27 miles of those trails, including Trails # 279, 280, 420 (in part), 426, and 500, and thereby increase security for wildlife.

88.  Contrary to the agency's representations in the EIS, all 36.5 miles of motorized trails in the Project area have already been closed to motorized use by prior timber sale NEPA documents and other analysis documents.

89.  The following timber sale Environmental Assessments already require that these motorized trails be closed to the public:

•  Boundary Mountain Environmental Assessment:  Trails #281 and #420 are analyzed as closed yearlong to motorized travel.  In an internal memorandum in the East Reservoir project file, the Forest Service admits that "[o]pening these trails to motorized vehicles results in loss of security /displacement habitat and the intent of the EA is no longer met (effects analysis would be invalid)."

•  Canyon II Environmental Assessment: Trails  #279, 280, 281, 420, 426, and 500 are analyzed as closed yearlong  to motorized travel.  In an internal memorandum in the East Reservoir project file, the Forest Service admits that "[o]pening these trails to motorized vehicles would

encourage illegal use of motorized vehicles on the restricted roads and trails. The security area for big game would be decreased, and the District would no longer meet the intent of the EA (effects analysis would be invalid)."

- Cripple Horse Environmental Assessment: Trails #281 and 420 are analyzed as closed yearlong to motorized travel. In an internal memorandum in the East Reservoir project file, the Forest Service admits that allowing motorized use on these trails "would no longer meet the intent of the EA (effects analysis would be invalid)."

- Dunn Salvage Environmental Assessment: Trail #500 is analyzed as closed yearlong to motorized travel. In an internal memorandum in the East Reservoir project file, the Forest Service admits that by allowing motorized use on this trail "the intent of the EA would no longer be met (effects analysis would be invalid)."

- Dry Pocks Salvage Environmental Assessment: Trails #279, 280, 281, 420, 426, and 500 are analyzed as non-motorized. In an internal memorandum in the East Reservoir project file, the Forest Service admits that allowing motorized use on these trails "does not meet the intent of the EA (effects determination would be invalid)."

- Syrup Salvage Environmental Assessment: Trail #500 is analyzed as

non-motorized. In an internal memorandum in the East Reservoir project file, the Forest Service admits that "[i]f these trails are now open to motorized vehicles, intent of the EA would not be met (effects analysis would be invalid)."

- West Dry Sweep Environmental Assessment: Trail #500 is analyzed as non-motorized. In an internal memorandum in the East Reservoir project file, the Forest Service admits that allowing motorized use on this trail "encourages illegal use of motorized vehicles on the restricted roads and trails, the security area is decreased to the point of being ineffective, and the intent of the EA is not met (effects analysis would be invalid)."

- West Dry III Environmental Assessment: Trails #279, 280, 281, 420, 426, and #500 are analyzed as closed yearlong to motorized use. In an internal memorandum in the East Reservoir project file, the Forest Service admits that allowing motorized use on these trails "does not meet the intent of the EA (effects analysis would be invalid)."

- Warland Salvage Environmental Assessment: Trails #279, 280, and 426 are analyzed as closed yearlong to motorized use. In an internal memorandum in the East Reservoir project file, the Forest Service admits that by allowing motorized use on these trails "the security area

is decreased to the point of being ineffective, and does not meet the intent of the EA (effects analysis would be invalid)."

• _Weigel Salvage Environmental Assessment_: Trails #279, 426, 279 and 280 are analyzed as closed yearlong to motorized use. In an internal memorandum in the East Reservoir project file, the Forest Service admits that by allowing motorized use on these trails "the security area is decreased to the point of being ineffective, and does not meet the intent of the EA (effects analysis would be invalid).

90. By issuing a Project decision that allows motorized use on approximately 9.5 miles of previously closed motorized trails in the Project area, including Trail #281 and part of Trail # 420, the agency is actually opening 9.5 miles of trail to motorized trail use in the Project area and thereby decreasing wildlife security.

AQUATIC SPECIES

91. The bull trout is an ESA-listed threatened fish species that is present on the Forest.

92. Bull trout are known to be in Lake Koocanusa.

93. The bull trout in Lake Koocanusa are migratory and move into streams for spawning and rearing.

94. Fivemile Creek in the Project area has mention of bull trout use, which is

anecdotal and from past professional judgment and personnel communications. An occasional bull trout may migrate into the system.

95. Based upon Montana Department of Fish Wildlife and Parks' "MFISH Data," bull trout are found in Fivemile Creek, but only rarely.

96. Another analysis document in the record indicates that bull trout "bt" have also been found in the segment of Cripple Horse Creek identified as "Cripple #1."

97. The East Reservoir analysis area includes Dunn Creek, Canyon Creek, Cripple Horse Creek, Warland Creek, Fivemile Creek, and portions of Lake Koocanusa and the Kootenai River.

98. Potentially affected watersheds in the Project analysis area include Lake Koocanusa, the Kootenai River, Dunn Creek, Canyon Creek, Cripple Horse Creek, Warland Creek, Five Mile Creek and tributary streams to these drainages.

99. Project road reconstruction and maintenance may increase sediment movement from road surface runoff, and could directly input nutrients and contaminants into live streams.

100. Sediment generated from timber harvest and road activities has the potential to generate sediment within the Fivemile Creek watershed.

101. The critical habitat rule for bull trout states that upland management practices

such as road construction, use, and maintenance or timber harvest can affect aquatic habitat for bull trout.

102. In this Project area, there has been extensive logging along streams resulting in moderate to high road densities and numbers of stream crossings, and many roads within riparian habitat conservation areas.

103. The large amount of roading coupled with high numbers of stream crossings is routing large amounts of sediment into streams.

104. Increasing sediment production is generally associated with ground based harvest systems and particularly road construction. Sediment decreases habitat diversity, degrades spawning and rearing habitat, degrades aquatic insect production, and consequently fish reproduction and survival.

105. The Inland Native Fish Strategy Riparian Management Objective for pool quantity is not being met in the Project area, and sediment from high roading could be filling pools.

106. Bull trout are less likely to use highly roaded basins for spawning and rearing and, if present in such areas, are likely to be at lower population levels.

107. The overall total road density, riparian road density, and stream crossing density in the affected watersheds would be increased due to new road construction for the Project.

108. The construction of new roads would result in an impact on water resources.

109. The Forest Service admits that "[t]here may be some short-term adverse effects to fish habitat as a result of proposed timber harvest and road building" and that "the proposed roadwork could involve short-term effects on trout populations."

110. The Forest Service prepared a biological assessment for the Project that addresses grizzly bear, lynx, water howellia, and spalding's campion.

111. The Forest Service did not include bull trout in the biological assessment for the Project.

112. The Forest Service did not engage in ESA consultation with FWS regarding the potential impact of the Project on bull trout.

113. The Forest Service asserts that the Project will have "no effect" on bull trout.

SITE-SPECIFIC FOREST PLAN AMENDMENTS

114. The Project includes four project-specific Forest Plan amendments to exempt the Project from Forest Plan standards that would have prohibited the large clearcuts and modified clearcuts authorized by the Project.

115. The first project-specific amendment exempts the Project from Management Area 15 visual quality standards.

116. The second project-specific amendment exempts the Project from Management Area 12 visual quality standards.

117. The third project-specific amendment exempts the Project from Management

Area 16 visual quality standards.

118. The fourth project-specific amendment exempts the Project from Management Area 12 wildlife standards.

119. The Forest Service did not conduct a cumulative effects analysis on the environmental impacts to the Forest from its repeated site-specific amendments to the Forest Plan.

120. The Forest Service did not disclose or discuss past site-specific forest plan amendments in the EIS.

121. The Forest Service did not disclose or discuss ongoing or reasonably foreseeable site-specific forest plan amendments in the EIS.

## VII. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

The Project and the agencies' analyses, actions ,and omissions regarding the grizzly bear violate the ESA, NFMA, NEPA, and the APA.

122. All previous paragraphs are incorporated by reference.

123. The Access Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Recovery Zones on the Forest include standards for grizzly bear habitat in BORZ polygons.

124. The standard for BORZ polygons is no net increase in linear miles of total roads, and no net increase in linear miles of open roads.

125. The Forest Service fails to demonstrate compliance with the Access Amendments because the Project authorizes a net increase of total and/or open roads added to the National Forest road system within the Tobacco BORZ.

126. The Forest Service fails to clearly disclose the increase in road density in the BORZ in the Project EIS.

127. The violation of the Access Amendment "no net increase" standard indicates that the Project will result in unpermitted take, and cause adverse effects that were not previously addressed in the biological assessment and biological opinion for the Access Amendments.

128. The agencies' conclusion that the Project will not likely adversely affect the grizzly bear is arbitrary and capricious. For example, among other adverse effects, the Project area has an existing high road density that already causes adverse effects, and the Project will reconstruct and improve access conditions on those roads, increase new system road density, open motorized trails that were closed by prior NEPA analyses, remove vegetative cover, allow clearcuts next to open roads to increase the potential for poaching, and cause grizzly bears to be displaced from thousands of acres from log-harvesting operations, log-hauling operations, and low-altitude helicopter burning operations. The direct, indirect, interrelated, and interdependent

effects of the Project will likely cause at least one adverse effect to at least one grizzly bear.

129.   Accordingly, the Forest Service's failures to comply/demonstrate compliance with the Forest Plan and failure to provide a clear and honest disclosure regarding motorized road and trail density in the Project area violate NFMA and NEPA; the agencies' conclusion that the Project is not likely to adversely affect grizzly bears violates the ESA and APA; and the lack of an incidental take permit for this Project violates the ESA.

## SECOND CLAIM FOR RELIEF

The Project, Lynx Amendment, and the agencies' analyses, actions ,and omissions regarding lynx and lynx critical habitat violate the ESA, NFMA, NEPA, and the APA.

130.   All previous paragraphs are incorporated by reference.

131.   The Northern Rockies Lynx Management Direction (Lynx Amendment) on the Forest includes standards for habitat within Lynx Analysis Units.

132.   Lynx Amendment Standard ALL S1 requires: "New or expanded permanent development and vegetation management projects must maintain habitat connectivity in an LAU and/or linkage area."

133.   The Forest Service fails to comply/demonstrate compliance with Standard ALL S1 in the Project EIS. Rather than maintaining habitat connectivity, the

Project increases fragmentation and habitat loss in the Project area. The

Project allows the clearcutting of hundreds of acres of lynx habitat and the

best available science indicates that lynx avoid travel through clearcuts.

Additionally, the preferred winter lynx habitat, old growth forest, is already

scattered in small, isolated stands bordered by old clearcuts throughout the

Project area, and those stands will be further fragmented and degraded by this

Project. Finally, the agency admits that the Project will remove 14 areas of

existing movement corridors. These factors were not addressed in the

agency's analysis of Standard ALL S1 in the EIS.

134. The agencies' conclusion that the Project will not likely adversely affect the

lynx or lynx crtical habtat is arbitrary and capricious.

135. The Project relies on an exception to Lynx Amendment Standard VEG S5 for

precommercial thinning projects for daylight thinning around rust-resistant

white pine. The use of an exception to the Lynx Amendment standards

indicates that the Project will likely have at least one adverse impact on at

least one lynx.

136. Additionally, the agencies cannot rely upon the Lynx Amendment and its

2007 biological opinion for their analysis of the Project's impacts on lynx

critical habitat because that 2007 biological opinion does not analyze the

impacts of the Lynx Amendment on lynx critical habitat.

137. Furthermore, the Project allows for logging and thinning in over 5,000 acres of lynx critical habitat. These are the two habitat management activities that are most likely to adversely affect lynx. The logging includes hundreds of acres of large clearcuts, and lynx are known to avoid clearcuts. Addtionally, lynx prefer old growth forest for winter habitat and only 1% of the Project area is actual old growth forest, and the Project allows for the further fragmentation and degradation of that limited habitat. In sum, 5,000 acres of logging and thinning in lynx critical habitat, including hundreds of acres of clearcutting and degradation of what rare old growth habitat currently exists, is likely to have at least one adverse impact on at least one lynx.

138. Finally, the agencies must reconsult on the impacts of the Lynx Amendment on lynx critical habitat. The existing 2007 biological opinion for the Lynx Amendment was issued before any lynx critical habitat was designated on National Forest lands in 2009; thus the biological opinion does not address any impacts that implementation of the Lynx Amendment is having on lynx critical habitat on National Forest lands. Until that consultation is completed, the agencies must be enjoined from further logging and thinning in lynx critical habitat.

139. Accordingly, the Forest Service's failures to comply/demonstrate compliance with the Forest Plan violate NFMA and NEPA; the agencies' conclusion that

the Project is not likely to adversely affect lynx and lynx critical habitat

violates the ESA and APA; and the agencies' failure to complete

reconsultation on the impacts of the Lynx Amendment on lynx critical habitat

violates the ESA and APA.

THIRD CLAIM FOR RELIEF

The Forest Service's "no effect" conclusion for bull trout, and failure to include bull

trout in the Project biological assessment and consult with FWS regarding bull trout,

violate the ESA and the APA.

140.   All previous paragraphs are incorporated by reference.

141.   Bull trout may be present in the Project area, within Lake Koocanusa, as well

as within streams in the Project area.

142.   Potential for migratory presence requires a "may be present" determination.

143.   The types of activities authorized by the Project are the types of activities that

may affect bull trout.

144.   Any possible effect, no matter how small, and no matter whether the effect is

beneficial or adverse, requires a "may affect" conclusion.

145.   The Forest Service's "no effect" conclusion for bull trout, as well as its

failure to include bull trout in the Project's biological assessment and consult

with FWS, are arbitrary and capricious and violate the APA and ESA.

## FOURTH CLAIM FOR RELIEF

**The Forest Service's failure to provide a cumulative effects analysis on the impact of past, present, and reasonably foreseeable site-specific Forest Plan amendments across the Forest violates NEPA and NFMA.**

146.  All previous paragraphs are incorporated by reference.

147.  When addressing "site-specific" amendments to a forest plan, the cumulative impact analysis must address forest-wide impacts because otherwise the Forest Service will be free to ignore standards throughout the forest on a piecemeal basis, without ever having to evaluate the amendments' cumulative environmental impacts.

148.  The Forest Service authorized four site-specific Forest Plan amendments for the Project in order to exempt the Project from complying with Forest Plan standards that limit logging.

149.  The EIS does not provide the public with a cumulative effects analysis that discloses past, present, and reasonably foreseeable site-specific Forest Plan amendments across the Forest and the cumulative impact of all of those Forest Plan exemptions on the Forest.

150.  The Forest Service's failure to provide the public with a Forest-wide cumulative effects analysis for the site-specific Forest Plan amendments in the EIS violates NEPA, NFMA, and the APA.

FIFTH CLAIM FOR RELIEF

<u>The Forest Service's analysis on wildlife security, roads, and motorized trails in the</u>
<u>Project EIS is misleading and fails to fully and fairly inform the public in violation of</u>
<u>NEPA, NFMA, and the APA.</u>

151.  All previous paragraphs are incorporated by reference.

152.  In the Project EIS, the Forest Service fails to disclose that the motorized trails
      in the Project area were already closed to motorized use by prior timber sale
      NEPA decisions, and that by now signing a decision allowing motorized use
      on these trails, the agency will actually be re-opening 9.5 miles of motorized
      trails in the Project area and thereby decreasing wildlife security.

153.  In the Project EIS, the Forest Service fails to clearly explain what an
      "undetermined" road is, and fails to clearly disclose the National Forest
      System open and total road density before and after the addition of these
      "undetermined" roads to the National Forest road system.  The agency does
      not analyze the environmental impact of adding 13 miles of new roads into
      the system, and does not acknowledge that this addition of roads will increase
      road density in the Project area and Tobacco BORZ, and reduce wildlife
      security.

154.  In the Project EIS, the Forest Service fails to clearly disclose that it has
      recategorized 27.21 miles of decommissioned roads as existing closed roads

(intermittent stored service) in the Project area because the road prism still exists on the landscape. Although the agency's analysis in the project file indicates that the agency knows that this change will increase total road density in the Project area, the agency neither clearly discloses that increase in total road density to the public in the Project EIS, nor discusses its impact on wildlife security.

155. The agency's failures to fully and fairly inform the public regarding motorized trails, undetermined roads, and decommissioned roads converted to closed roads, and their impacts on wildlife, in the Project EIS violate NEPA, NFMA, and the APA.

## VIII. RELIEF REQUESTED

For all of the above-stated reasons, Plaintiff requests that this Court award the following relief:

A.    Declare that the Project violates the law;

B.    Enjoin implementation of the Project;

C.    Award Plaintiff its costs, expenses, expert witness fees, and reasonable attorney fees under the ESA and/or under EAJA; and

D.    Grant Plaintiff any such further relief as may be just, proper, and equitable.

Respectfully submitted this 11th Day of May, 2015.


                        */s/ Rebecca K. Smith*
                        Rebecca K. Smith
                        PUBLIC INTEREST DEFENSE CENTER, PC

                        Timothy M. Bechtold
                        BECHTOLD LAW FIRM, PLLC

                        Attorneys for Plaintiffs