W. Carl Mendenhall, Esq.
Matthew J. Cuffe, Esq.
WORDEN THANE P.C.
111 N. Higgins Ave., Ste. 600
P.O. Box 4747
Missoula, Montana 59806
Telephone: (406) 721-3400
Fax: (406) 721-6985
Email: cmendenhall@wordenthane.com
Email:  mcuffe@wordenthane.com

Lawson E. Fite, Ore. Bar #055573 (Pro Hac Vice)
American Forest Resource Council
5100 S.W. Macadam, Suite 350
Portland, Oregon 97239
Telephone: (503) 222-9505
Fax: (503) 222-3255
Email: lfite@amforest.org

Attorneys for Defendant-Intervenors

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES,<br><br>    Plaintiff,<br><br>            vs.<br><br>CHRISTOPHER SAVAGE, et al.,<br><br>    Defendants,<br>            and<br><br>KOOTENAI FOREST STAKEHOLDERS COALITION, a Montana Corporation and LINCOLN COUNTY, a political subdivision of the State of Montana.<br><br>    Defendant-Intervenors. | Civil No. 9:15-cv-00054-DLC<br><br>**DEFENDANT-INTERVENORS' STATEMENT OF GENUINE ISSUES IN RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS [ECF NO. 19]** |

Pursuant to Local Rule 56.1(b), defendant-intervenors Kootenai Forest Stakeholders Coalition and Lincoln County submit the following Statement of Genuine Issues in response to Plaintiff's Statement of Undisputed Facts, Dkt. 19. Except as stated below, defendant-intervenors join in federal defendants' statement of Genuine Issues, Dkt. 35. Except as specifically admitted or qualified herein, defendant-intervenors dispute each of plaintiff's statements of undisputed fact and assert that disputes of material fact exist.

\* \* \*

7. The Project area has also been heavily logged: commercial logging has occurred on 43,673 acres, including over 22,000 acres of clear-cutting. AR1191-1192.

**Response: Intervenor-defendants dispute this statement. As noted by federal defendants, Dkt. 35 at 5, the referenced harvest areas include areas that are not owned by the Forest Service. Additionally, plaintiff incorrectly equates the term regeneration harvest with "clear-cutting." Clearcuts can be part of a regeneration harvest, but the majority of regeneration harvest acres in any forest are not clearcuts.**

\* \* \*

14. In part as a result of past timber harvest, Cripple Horse Creek is currently impaired for aquatic life support and cold-water fisheries due to siltation.

AR1338.

**Response: Intervenor-defendants dispute this statement. The record indicates that Cripple Horse Creek was listed in 1996 as a water body that was not meeting water quality guidelines. FS001338. The source of the impairment was listed at that time as "agriculture, natural resources, and silviculture." The record does not support a statement that Cripple Horse Creek is *currently* impaired due to timber harvest.**

15. The Project authorizes commercial logging on 8,845 acres, including clear-cutting or modified clear-cutting on 3,458 acres. AR29259.

**Response: Defendant-intervenors join in federal defendants' response. Defendant-intervenors further dispute plaintiff's characterization of regeneration harvest as "clear-cutting or modified clear-cutting." As stated in the Record of Decision, total regeneration harvest is 3,458 acres. FS029272. Of those 3,458 acres, only 521 acres (15%—or 5.8% of total harvest area) are "clearcut with reserves." The other regeneration treatments are as described in the Record of Decision.**

16. The Project authorizes nine clear-cuts or modified clear-cuts that will exceed the Forest Plan's 40 acre limitation. AR29265, 29270-29271.

**Response: Intervenor-defendants dispute this statement. Regeneration is not the same as "clear-cuts or modified clear-cuts." The only "clear-cut or**

modified clear-cut" that exceeds 40 acres is in unit 362. FS029271. Unit 362 is designed to create a fire break next to a fire transmission line. FS029379. Additionally, the Project involves four Forest Plan Amendments to allow for regeneration harvest units in excess of 40 acres. FS029270-71, 29274-75, 029351-53 (text of Forest Plan amendments).

\* \* \*

36. The Project authorizes the construction of roads adjacent to or through old growth stands, and authorizes additional clearcutting or modified clearcutting next to old growth stands. AR29265.

**Response: Defendant-intervenors dispute this statement and join in federal defendants' response. Plaintiff erroneously equates regeneration harvest with clearcuts. Defendant-intervenor additionally states that the selected alternative involves 1,326 acres which are treated to maintain old growth or trend the stand toward old growth. FS029265.**

\* \* \*

47. Within the Tobacco Zone, the Project will change the restriction status on 7.9 miles of roads to "intermittent stored service" status, which is a category that "will continue to contribute to the cumulative baseline condition for linear total miles of road . . . ." AR29376.

**Response: Defendant-intervenors do not dispute this statement, with the**

clarification that intermittent stored service roads contribute to the total linear miles baseline, but not to the total open miles baseline. FS029376.

* * *

49. The Forest Service concedes that the existing condition of the Tobacco Zone is already having adverse effects on grizzly bears. AR5813.

**Response: Defendant-intervenors join in federal defendants' response and further clarify that the biological opinion for the Access Amendments found that the amendments were not likely to jeopardize the continued existence of grizzly bear, and issued an incidental take statement, thus satisfying obligations under ESA sections 7 and 9 and permitting adverse effects to bears within the scope of the Access Amendments. FS027570, 027575-80. The Forest Service found, and FWS agreed, that the effects of this Project are within the scope of the previous consultation. FS005813. Additionally, the "existing condition" of the Tobacco Zone is part of the environmental baseline, so adverse effects from the existing condition are not attributable to agency action. 50 C.F.R. § 402.02; *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 930 (9th Cir. 2008) (holding that environmental baseline is not included in effects of the action subject to ESA review).**

* * *

58. Within lynx critical habitat, the Project allows commercial logging via clear-cutting of 1,269 acres of mature boreal forest, precommercial thinning of 212 acres of snowshoe hare habitat, and precommercial thinning of 3,564 acres of matrix forest (hardwood forest, dry forest, non-forest, or other habitat types that do not support snowshoe hares) for a total of 5,045 acres of commercial and precommercial logging of lynx critical habitat. AR5817, 5819; see also AR5847.

**Response: Defendant-intervenors join in federal defendants' response. Additionally, defendant-intervenors state that plaintiff erroneously equates regeneration harvest with "clearcut." Only 521 acres in the entire Project are "clearcut with reserves." FS029272. The Project meets Forest Plan standards for regeneration harvest in lynx habitat, as only 6% of the relevant habitat will have regenerated within the past 10 years, compared to the Forest Plan maximum of 15% (standard VEG S2). FS001498.**

59. The clearcutting of 1,269 acres of mature boreal forest in lynx critical habitat will increase the amount of unsuitable winter snowshoe hare habitat from 4.0% to 8.3%, and increase the percentage of clearcuts or modified clearcuts, i.e. "regeneration," on lynx habitat in the last 10 years from 1.7% to 5.8%. AR5816, 5817.

**Response: Intervenor-defendants join federal defendants' response in full. Intervenor-defendants additionally state that plaintiff's characterization**

of regeneration harvest as "clearcuts or modified clearcuts" is erroneous. **FS029272.**

\* \* \*

64. The Project will remove 14 areas of movement corridors. AR5883.

**Response: Intervenor-defendants agree with this statement with the clarification that none are identified linkage corridors, FS005815, and none of the 14 corridors are identified as specific to lynx.** *Id.* **Intervenor-defendants further state that the Project maintains lynx habitat connectivity as required by Forest Plan standard ALL S1. FS001496-97.**

\* \* \*

69. "The management of human use levels through access route management is one of the most powerful tools available to balance the needs of grizzly bears, and many species of wildlife, with the needs and activities of humans. It has been documented in several research projects that human access and development within grizzly bear habitat can contribute to increased bear mortality and affect bear use of existing habitat." ARFWS1277.

**Response: Defendant-intervenors agree that plaintiff has accurately quoted the cited document, which speaks for itself and is the best evidence of its contents. The cited document is a 1998 task force report which may not reflect the most up-to-date information regarding management for grizzly**

**bear.**

* * *

74. Contrary to the representations made to the public in the EIS, all 36.5 miles of motorized trails in the Project area have already been closed to motorized use by prior timber sale NEPA documents and other analysis documents:

   a. Boundary Mountain Environmental Assessment: Trails #281 and #420 are analyzed as closed yearlong to motorized travel. In an internal memorandum, the Forest Service admits that "[o]pening these trails to motorized vehicles results in loss of security /displacement habitat and the intent of the [Boundary Mountain] EA is no longer met (effects analysis would be invalid)." AR620.

   b. Canyon II Environmental Assessment: Trails #279, 280, 281, 420, 426, and 500 are analyzed as closed yearlong to motorized travel. In an internal memorandum, the Forest Service admits that "[o]pening these trails to motorized vehicles would encourage illegal use of motorized vehicles on the restricted roads and trails. The security area for big game would be decreased, and the District would no longer meet the intent of the [Canyon II] EA (effects analysis would be invalid)." AR620.

   c. Cripple Horse Environmental Assessment: Trails #281 and 420 are

analyzed as closed yearlong to motorized travel. In an internal memorandum, the Forest Service admits that allowing motorized use on these trails "would no longer meet the intent of the [Cripple Horse] EA (effects analysis would be invalid)." AR620.

    d.    Dunn Salvage Environmental Assessment: Trail #500 is analyzed as closed yearlong to motorized travel. In an internal memorandum in the East Reservoir project file, the Forest Service admits that by allowing motorized use on this trail "the intent of the [Dunn Salvage] EA would no longer be met (effects analysis would be invalid)." AR621.

    e.    Dry Pocks Salvage Environmental Assessment: Trails #279, 280, 281, 420, 426, and 500 are analyzed as non-motorized. In an internal memorandum, the Forest Service admits that allowing motorized use on these trails "does not meet the intent of the [Dry Pocks] EA (effects determination would be invalid)." AR621.

    f.    Syrup Salvage Environmental Assessment: Trail #500 is analyzed as non-motorized. In an internal memorandum, the Forest Service admits that "[i]f these trails are now open to motorized vehicles, intent of the [Syrup Salvage] EA would not be met (effects analysis would be invalid)." AR621.

g. West Dry Sweep Environmental Assessment: Trail #500 is analyzed as non-motorized. In an internal memorandum, the Forest Service admits that allowing motorized use on this trail "encourages illegal use of motorized vehicles on the restricted roads and trails, the security area is decreased to the point of being ineffective, and the intent of the [West Dry Sweep] EA is not met (effects analysis would be invalid)." AR621-622.

h. West Dry III Environmental Assessment: Trails #279, 280, 281, 420, 426, and #500 are analyzed as closed yearlong to motorized use. In an internal memorandum in the East Reservoir project file, the Forest Service admits that allowing motorized use on these trails "does not meet the intent of the [West Dry III] EA (effects analysis would be invalid)." AR622.

i. Warland Salvage Environmental Assessment: Trails #279, 280, and 426 are analyzed as closed yearlong to motorized use. In an internal memorandum in the East Reservoir project file, the Forest Service admits that by allowing motorized use on these trails "the security area is decreased to the point of being ineffective, and does not meet the intent of the [Warland Salvage] EA (effects analysis would be invalid)." AR622.

j.  Weigel Salvage Environmental Assessment: Trails #279, 426, 279 and 280 are analyzed as closed yearlong to motorized use. In an internal memorandum in the East Reservoir project file, the Forest Service admits that by allowing motorized use on these trails "the security area is decreased to the point of being ineffective, and does not meet the intent of the [Weigel Salvage] EA (effects analysis would be invalid)." AR622-623.

**Response: Intervenor-defendants join federal defendants' response and dispute this statement, including subparts (a)-(j). Intervenor-defendants additionally state that the project team determined these trails have been open to public use since at least 2006. FS000617. Accordingly, analyzing these trails as open reflects actual on-the-ground conditions.**

\* \* \*

93. In the EIS, the Forest Service asserts that the Project will have "no effect" on bull trout because the agency believes "[t]here is a lack of evidence proving the existence of bull trout within streams in the analysis area." AR1320.

**Response: Defendant-intervenors agree with this statement with the clarification that quotation is from the draft EIS, and that the draft EIS also states that bull trout in Lake Koocanusa ("the Reservoir") "will not be impacted by the proposed project." FS001320.**

Respectfully submitted this 25th day of November, 2015.

/s/ W. Carl Mendenhall
W. Carl Mendenhall, Esq.
Matthew J. Cuffe, Esq.

/s/ Lawson E. Fite
Lawson E. Fite

Attorneys for Defendant-Intervenors