Kristine M. Akland
317 East Spruce Street
Missoula, Montana 59802
Telephone: (406) 544-9863
kristine@matriumlaw.com

Rachel M. Fazio (*Pro Hac Vice* Applicant)
Attorney at Law
PO Box 897
Big Bear City, CA 92314
Phone:  530-273-9290
Fax:  909-906-1187
rachelmfazio@gmail.com
Attorneys for Amici Curiae

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | CV-15-54-M-DLC |
| Plaintiff, | |
| v. | BRIEF OF AMICI CURIAE |
| | Blue Mountains Biodiversity Project; Buckeye Forest Council, Inc., Conservation Congress, Friends of Bell Smith Springs, Friends of the Bitterroot, Friends of the Clearwater, Friends of the Wild Swan, Heartwood, Idaho Sporting Congress, Kootenai Environmental Alliance, Montana Ecosystems Defense Council, Native Ecosystems Council, Sequoia ForestKeeper, Swan View Coalition, Tennessee Heartwood, Western Lands Project, Yellowstone to Uintas Connection, Dr. Brian Horejsi, Barry Rosenberg, Dr. Chad Hanson, Dick Artley, Doug Soehren, Frank Robey, George Wuerthner, Jeff Juel, Larry Campbell, Paul Edwards, Polly Pfister and Rocky Smith. |
| CHRISTOPHER SAVAGE, Kootenai National Forest Supervisor, et al., | |
| And | |
| LINCOLN COUNTY, et al., | |

## Table of Contents

Table of Authorities…………………………………………….…i

I.      Amici……………………………………………………….…..1

II.     The Origin and Purpose of National Forests……………………..1

III.    The Endangered Species Act……………………………….…..8

## Table of Authorities

**Cases**

*Alliance for Wild Rockies v. Bradford,*
    35 F.Supp.3d 1246, 1249 (D. Mont.2014)……………...………………..9

*Chicago, M. & St. P. Ry. Co. of Idaho v. United Stat*es,
    218 F. 288, 292 (9th Cir. 1914) *aff'd* 244 U.S. 351(1917)…..……………..2

*Karuk Tribe of California v USFS,*
    681 F.3d 1006,1027 (9th Cir.2012)……………………………………12

*Sierra Club v. Morton,*
    405 U.S. 727, 748 and ftnt. 7, 92 S.Ct. 1361, 1372 (1972)………………3

*United States v. Parker,*
    36 F.Supp. 3d 550, 569 (W.D.NC. 2014)……………………...………..2

*Utah Power & Light v. United States,*
    243 U.S. 389, 409, 37 S.Ct. 387(1916).………………………………1

*Von Saher v. Norton Simon Museum of Art at Pasadena,*
    578 F.3d 1016 (9th Cir. 2009)…………………………………...……6

**Statutes:**

26 Stat. 1103……………………………………...…………………………..2

30 Stat. 11………………………………………...…………………....…2

36 Stat. 961……………………………………...……………………………2

16 U.S.C. §475…………………………………………………………..3

16 U.S.C. §528…………………………………………………………..3

16 U.S.C.A. §1531(a)……………………………………………………9

16 U.S.C.A. §1531(a)(3)……………………………………………….....9

16 U.S.C.A. §1531(b)……………………………………………………9

16 U.S.C. §1531(5)…………………………………………………..…12

**Other:**

United States Fish and Wildlife Endangered Species Act §7 Handbook
    xv-xvi, 4-1 and B-56……...…………………………………...12

## I.     Amici

Amici are a collection of conservation groups and individuals who work to protect and conserve public lands throughout the United States. Amici recognize that National Forests have intrinsic and natural value, are exceedingly important to conserve habitat and species, watersheds and water quality, and represent one of our best chances at combatting the negative effects of climate change.

One thing that Amici all have in common is, though they may work in specific States or regions, they recognize the national ecological importance of federal public lands, regardless of geographic location, especially when it comes to clean water, aesthetic enjoyment, conserving native ecosystems, species conservation and climate change.

## II.     The Origin and Purpose of National Forests

"All public lands of the United States are held by it in trust for the people of the United States." *Utah Power & Light v. United States*, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791 (1916). Yet, a disturbing trend has been developing in this country that emphasizes local control over National Forests and wildlands.  Even here, where this court is reviewing the merits of Alliance for the Wild Rockies' legal claims, several of the participants in this litigation are using their participation to infuse these proceedings with arguments focused on how their private interests will be affected by the outcome of this case. However, National Forests were not created to serve local

1

interests.  In fact, forest reserves, as they were originally called[1], were created

specifically to reserve forest lands from the public domain and protect them, whereas

previously anyone could privately benefit from these areas in accordance with their

efforts and abilities, and where application of previous acts of Congress, the Timber

Culture Act of 1873 and the Homestead Act of 1873, were riddled with fraud for

personal gain. *United States v. Parker*, 36 F.Supp. 3d 550, 569 (W.D.NC. 2014).  The

Forest Reserve Act (originally known as the Act of March 3, 1891) authorized the

President of the United States to "set apart and reserve, from time to time, in any

state or territory having public land bearing forests, any part of the public lands

wholly or in part covered with timber or undergrowth, whether of commercial value

or not, as *public* reservations; the same to be by public proclamation, declaring the

establishment of such reservations and the limits thereof." *Chicago, M. & St. P. Ry. Co.*

*of Idaho v. United Stat*es, 218 F. 288, 292 (9th Cir. 1914), *aff'd* 244 U.S. 351, 37 S. Ct. 625,

61 L. Ed. 1184 (1917), *citing* 26 Stat. 1103 (*emphasis added*).

While it is true that, since the Forest Reserve Act was passed, there has been

pushback from Western States and timber interests to prioritize and increase timber

production on these lands [*see e.g.*, The Forest Management Act of June 4, 1897 (30

Stat. 11); The Weeks Act (36 Stat.961)], National Forests are firmly established as

---

[1] Administration of forest reserves was transferred from the Secretary of the Interior
to the Secretary of Agriculture in 1905 (Act of Feb. 1, 1905, 33 Stat.628, 16 USC
§472) and what would become the National Forest System (governing the forest
reserves) was established by the Weeks Forestry Act in 1911 [Act of Mar. 1, 1911, ch.
186, §§ 4-14, 36 Stat.961, 962-3 (1911)].

2

areas which Congress has directed to be managed for multiple use for national and public purposes, not local gain, and shall be, as far as practicable, controlled and administered in accordance with the following purposes: improving and protecting the forests within the boundaries; securing favorable conditions of water flows; furnishing a continuous supply of timber for the use and necessities of citizens (16 U.S.C. §475); and providing for outdoor recreation, range, timber, watershed and wildlife and fish purposes (16 U.S.C. §528). *See also Sierra Club v. Morton*, 405 U.S. 727, 748 and ftnt. 7, 92 S.Ct. 1361, 1372 (1972).

Defendants in this case assert that the East Reservoir Project complies with the law in part because they (US Forest Service) received support for, or gave support to (Kootenai Collaborators), the East Reservoir Project. *See e.g.*, Doc. 40, pp. 1-5. However, the fact that a group of local, like-minded individuals/groups, with superficial differences[2], agree on a multi-year logging project, which will economically benefit a subset of the local community and the Forest Service, is not a proxy for legal compliance. *Id.*  In fact, it is not even evidence that what has been proposed is a good

_____

[2] For example, the Montana Wilderness Association is fully committed to extensively logging outside of Wilderness areas so long as Wilderness areas are not logged, and no wilderness areas are involved in the East Reservoir Project; and the Yaak Valley Forest Council and Lands Project both are invested in collaboration and fully support logging for local economies.  In fact, the Kootenai Forest Stakeholders Coalition is fully aligned with the Forest Service's timber objectives, approving of the annual logging of 70-90 million board feet of saw logs from the Kootenai National Forest and even encouraging active timber management on lands which have been designated as *unsuitable* for timber production (https://www.workingforest.com/forest-coalition-adopts-guidelines/).

idea or that it will be ecologically beneficial.  All that this agreement indicates is that

these individuals and organizations are invested in a particular subset of their

community and its human inhabitants.  Certainly Defendants disparage Alliance for

the Wild Rockies for not getting behind the Project, but Alliance's interests are

broader than those of a local grouping of collaborators (as this Amici Brief attests),

and these interests are in fact divergent from those of Defendants.  Alliance for the

Wild Rockies' mission is to "secure the ecological integrity of the Wild Rockies

Bioregion"; they view the region through the science of conservation biology and see

the thousands of miles of logging roads (and the logging these roads facilitated) as a

fundamental problem because they "fragment[] ecosystems and eliminate habitat for

sensitive species" (www.allianceforthewildrockies.org).  Their solution is to use every

tool available to them (including going to Court to ensure compliance with

environmental laws passed by Congress) to "[p]rotect large blocks of secure habitat to

serve as core areas, and connect these blocks through linkage corridors" for imperiled

wildlife. *Id.*  The East Reservoir Project authorizes over 8,000 acres of commercial

logging and almost 6,000 acres of thinning, increases the total amount of roads within

the project area (including permanent and temporary), and amends the Forest Plan to

increase the size of areas that can be clearcut, locating many of these "regeneration"

harvests in the critical habitat of the ESA-listed Canada Lynx where it will eliminate

foraging use for 10 (summer) to 30 (winter) years. Doc. 35, ¶¶15-17, 19-22, 36, 55-57

and 61; Doc. 19, ¶¶34 and 58-60. Instead of being condemned, Alliance for the Wild

4

Rockies should be recognized for representing a broad national and public interest consistent with the purposes for which National Forests were established, and one that extends far beyond the borders of County and State.

   As intended, National Forests transcend the needs of the State and the local economies.  With rural development and 100 + years of resource extraction on public and private lands, the importance of National Forests as refuges for native ecosystems and wildlife, sources of clean water, and as areas which can help combat the anticipated negative effects of climate change, has been amplified.  Amici from as far away as Tennessee, Maine and Ohio are affected by the logging proposed in the East Reservoir Project and its impact on recovering wildlife species (*see* ESA section below).  This logging project would also affect Amici by reducing the project area's ability to store carbon (through the removal of tens of thousands of trees), while increasing carbon emissions into the atmosphere from logging and road building activities which will persist through the life of the project (including chainsaws, fellerbunchers, log trucks, bulldozers and increased mill activity, as well as reduced carbon storage in these forests), both of which will contribute to climate change. AR30278, AR17457, Exhibit A (abstract from Campbell et al. 2011). Put simply, State borders and County lines no longer contain the adverse effects from resource extraction, nor do they contain the fiscal costs of such activities.  The East Reservoir Project would cost American taxpayers, not just Lincoln County taxpayers, over $2.5

million dollars to implement. Doc. 19, ¶39.  The Project is forecast to generate less than half of that amount in revenue to Lincoln County. Doc. 41, ¶35.

In addition, the supposed national and public benefits of the extensive logging approved by the East Reservoir Project are shrouded in fear and misunderstanding about fire's role in the forest ecosystem, and the unfounded belief that extensive landscape level logging, including removing large swaths of the forest ecosystem through clearcutting, or as Defendants like to call it "regeneration" harvest, will reduce future fire risk and intensity or increase the ecological resilience of an ecosystem adapted to mixed-severity fire.

There has been extensive research in forests about the ecological benefits of mixed-severity (which includes high-severity) fire over the past two decades, so much so that last year science and academic publishing giant Elsevier published a four hundred page book, *The Ecological Importance of Mixed-Severity Fires: Nature's Phoenix*[3] which synthesizes published, peer-reviewed science investigating the value of mixed- and high-severity fires for biodiversity (hereafter "*Nature's Phoenix*").  This book includes research documenting the benefits of high-intensity wildfire patches for

---

[3] http://store.elsevier.com/The-Ecological-Importance-of-Mixed-Severity-Fires/Dominick-DellaSala/isbn-9780128027493/.  Judicial notice of this publication is appropriate Under FRE 201(b). *Se,e e.g., Von Saher v. Norton Simon Museum of Art at Pasadena*, 578 F.3d 1016 (9th Cir. 2009), *amended and superseded, Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010).

species at issue in this case,[4] as well as a discussion of mechanical "thinning" logging, approved here, and its inability to reduce the chances of a fire burning in a given area, or alter the intensity of a fire, should one begin under high fire weather conditions, because overwhelmingly weather, not vegetation, drives fire behavior. Exhibit B (*Nature's Phoenix*, Ch. 13, pp. 382-384).  There is also strong consensus from over 260 US scientists that clearcutting ("regeneration logging") destroys and removes wildlife habitat in forests, does not create natural habitat heterogeneity, and does not mimic the ecological benefits of fire. Exhibit D (letter from 262 scientists to Congress). Finally, ecological resilience, which Defendants imply they are creating through this project, is not the absence of natural disturbances like wildfire or beetle kill, rather it is the opposite. AR3226, AR32351-64, AR32222, Exhibit B (*Nature's Phoenix*, Chapter 1,

---

[4] Mixed-severity fires, and in particular patches of high-severity fire, benefit Grizzly bears by: increasing cover of berry producing shrubs (such as huckleberry) that the bears rely upon to get fat before winter; promoting regeneration of whitebark pine— the seeds of which are an important food source for the bears; and by improving foraging habitat for prey species such as moose, elk, and deer. AR25569-71; AR25575-76 and Exhibit B (*Nature's Phoenix*, Ch. 4, pp. 89, 101). Grizzly Bears avoid logged and roaded areas because they do not provide the forest structures of post-fire habitat which benefit this species**.** *Id.* Natural, temporary pulses of sedimentation after mixed-intensity wildfire, in areas that are not post-fire logged, assist in restoring populations of native trout, including the bull trout, by creating gravel/sand beds in streams that serve as spawning grounds, and by increasing native aquatic insects upon which fish feed. AR15019; *see also* Exhibit B (*Nature's Phoenix*, Chapter 5, pp. 120-121). Chronic sedimentation, which occurs after mechanical disturbances of soil by road building and logging, does not provide the same benefits, and in fact degrades stream ecosystems. *Id.* and Exhibit B, p. 138.  And, Canada Lynx benefit from patches of high-intensity fire, as well as patches of forest with high tree mortality from native bark beetles, due to increased prey/foraging opportunities, whereas Lynx avoid logged areas, and scientists recognize fire suppression and logging as threats to the Lynx. AR30059-63 and Exhibit C (abstracts from Fox 1978 and Mowat and Slough 2003).

pp. 12-13).  Logging to prevent mixed-severity fires, as proposed by the East Reservoir Project, reduces the ecological resiliency of a forest, rather than achieving it. This is because processes like fire create and maintain the full range of natural habitat types and heterogeneity across the forest landscape, which in turn maintain the full range of native plant and animal biodiversity in the forest. Exhibit E (Thompson et al 2009)[5].  What Defendants are promoting here is the human control of the forest ecosystem through mechanical means in order to maintain unnatural stasis by eliminating, suppressing or altering natural disturbances such as wildfire, to facilitate the orderly extraction of commercial resources for human use.  This is known as engineering resilience and it is the antithesis of ecological resilience and conservation of native biodiversity. *Id.*

## III.   The Endangered Species Act:

Similar to Congressional acts which established National Forests for benefit of the Nation, so too was the Endangered Species Act passed for the benefit of all Americans.  The Endangered Species Act was enacted after Congress determined that:

**(1)** various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation;

---

[5] Thompson, I. *et al.* (2009) *Forest Resilience, Biodiversity, and Climate Change. A Synthesis of the Biodiversity/Resilience/Stability Relationship in Forest Ecosystems.* CBD Technical Series No. 43, Secretariat of the Convention on Biological Diversity, United Nations Environment Program.

**(2)** other species of fish, wildlife, and plants have been so depleted
in numbers that they are in danger of or threatened with
extinction;

16 U.S.C.A. §1531(a).  It contains a comprehensive scheme with the broad purpose of

providing "a means whereby the ecosystems upon which endangered species and

threatened species depend may be conserved". *Id.* at §1531(b).   In the course of

establishing this conservation program Congress found that "these [threatened or

endangered] species of fish, wildlife, and plants *are of esthetic, ecological, educational,*

*historical, recreational, and scientific value to the Nation and its people*". *Id.* at 1531(a)(3)

(emphasis added).

At issue in this case are three species listed as threatened under the Endangered

Species Act, the Grizzly Bear and Canada Lynx which will likely be adversely affected,

and the Bull Trout which may be affected, by the East Reservoir Project. These

species are not just of value (or a hindrance as the case may be) to local interests, but

they are of value to the American public, and represent a national interest protected

by the Act.  Where once Grizzly bears were over 50,000 strong roaming the United

States from Alaska to Mexico and California to Ohio, in the lower 48 U.S. states,

small breeding populations are currently confined to Wyoming, Idaho and Montana

and Washington, with an approximate population of only 1,500 bears between these

four states. *Alliance for Wild Rockies v. Bradford*, 35 F.Supp.3d 1246, 1249 (D.

Mont.2014).  It has taken almost 40 years for this small recovery to occur, and the fact

that there are still Grizzlies roaming the lands of the United States is a great comfort

to Amici, some of whom study the species, and many of whom recreate in their habitat and delight in the esthetic and ecological evidence of their presence (including potential sightings). Even those who may never have the privilege of traveling to these states and being in the presence of, or walking on the same trails as, these iconic omnivores care deeply about their conservation and recovery. Just knowing the Grizzly bears are there, being able to read about their behaviors in scientific studies and other publications, watching videos or viewing photos of Grizzly bears in the lower 48 states, and learning of their re-establishment in areas which they historically occupied but had been extirpated from by hunting and trapping, all represent hope for Amici. Hope that we as a country and a people can care for and conserve species other than our own, hope that progress can occur without obliterating the Nation's heritage in fish, wildlife and plants, and hope that places wild enough to support Grizzly Bears will continue to exist in this country. Natural resource extraction projects, such as the East Reservoir Project, that will likely harm the continued recovery of these species and threaten the establishment of healthy viable populations which continue in perpetuity, are of great concern to Amici and their members. These same interests also extend to the threatened Canada Lynx and Bull Trout.

As has been acknowledged by the Forest Service here, Bull Trout may be present on the Forest, are known to be in Lake Koocanusa (from which they migrate into streams for spawning and rearing), and have historically been present within Fivemile Creek, both of which are watersheds within the [Project] analysis area that

may be adversely affected by the project activities, and chronic sedimentation from logging and roads negatively impacts fish reproduction and survival. Doc 35, ¶¶79-82 and 88-89.

Federal Defendants admit that logging under the East Reservoir Project will occur on over 5,000 acres of Lynx critical habitat and that the 1,269 of these acres which will be clearcut will impede foraging behavior of the Lynx and its prey (snowshoe hare) for one to three decades depending on the season. Doc. 35, ¶¶55-58 and 61.  They also agree that in winter Lynx stay in their home ranges and utilize a narrow subset of habitat (dense old forest which would be removed by clearcutting), that the proposed logging would remove 14 areas of movement corridors, and that Lynx movements would be further impeded by the 3,500+ acres of forest thinning. *Id.* at ¶¶58 and 63-64.  The East Reservoir Project would more than double the amount of habitat within the Lynx analysis unit which is unsuitable for winter snowshoe hares and more than triples the percentage of habitat in this Lynx analysis unit which would be rendered unsuitable through clearcut/regeneration logging. *Id.* at ¶¶58-59. Even still, the Forest Service claims that the East Reservoir Project is not likely to adversely affect lynx or lynx critical habitat.  Doc. 17, §IV(C)2 at pp. 19-23.

The East Reservoir Project would impact the Tobacco Bears Outside Recovery Zone, an area where the federally listed Grizzly Bear is known to occur. Doc. 35, ¶¶40-42. The Forest Service concedes that the existing condition of the Tobacco Zone is already having adverse effects on grizzly bears. *Id.* at ¶49.  The Project's

11

logging would further reduce vegetative cover in the Tobacco Zone and create additional distances for bears to cover, leaving them more vulnerable to poaching (*Id.* at ¶¶53-54). In addition, there would be an increase within this Zone in the total linear miles of roads. Doc. 19, ¶48.  Total linear miles of roads and motorized trails would also increase elsewhere in the Project area where Grizzly Bears and their prey Elk may occur.  Doc. 35, ¶70-78.  Motorized access poses the most imminent threat to grizzly habitat and negatively affects habitat security for elk and grizzly bears. Doc. 35, ¶¶66-69.  The Forest Service also claims that the East Reservoir Project is not likely to adversely affect grizzly bears. Doc. 17, §IV(B)(2) at pp. 10-14.

The East Reservoir Project does not safeguard, for the benefit of all citizens, the Nation's heritage in fish and wildlife.  16 U.S.C. §1531(5).  Full compliance with the Endangered Species Act is required to protect the public's interest in our Nation's fish and wildlife.  This includes accurately representing when a threatened or endangered species "may" be affected by a resource extraction project, and admitting when such a project is likely to adversely affect listed species.  *Karuk Tribe of California v USFS*, 681 F.3d 1006,1027 (9th Cir.2012) (*en banc*); ESA §7 Handbook at xv-xvi, 4-1 and B-56**.**  Neither of these required safeguards has been met in the preparation of the East Reservoir Project.

DATED this 24th day of January, 2016

By:  */s/ Rachel M. Fazio*
Rachel M. Fazio
Attorney for Amici Curiae

12

**Certificate of Service**

I, Rachel M. Fazio, certify that on the 24th day of January 2016, I filed a copy of the preceding document and Exhibits A-E through the Court's CM/ECF electronic filing system, affecting service on all parties to this litigation.

/s/ Rachel M. Fazio
Rachel M. Fazio

13