

**FILED**

JUL 1 9 2016

Clerk, U S District Court
District Of Montana
Missoula

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | CV 15–54–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| CHRISTOPHER SAVAGE, Kootenai National Forest Supervisor, FAYE KRUEGER, Regional Forester of Region One of the U.S. Forest Service, UNITED STATES FOREST SERVICES, an agency of the U.S. Department of Agriculture, and UNITED STATES FISH & WILDLIFE SERVICE, an agency of the U.S. Department of the Interior, | |
| Defendants. | |
| and | |
| KOOTENAI FOREST STAKEHOLDER COALITION, a Montana Corporation, and LINCOLN COUNTY, a political subdivision of the State of Montana, | |
| Defendant-Intervenors. | |

Before the Court are cross-motions for summary judgment in this

environmental case centered on the East Reservoir Forest Restoration Project

-1-

southeast of Libby, Montana ("the Project"). For the reasons explained below, the Court grants the motions of Defendants and Defendant-Intervenors and denies Plaintiff's motion.

## BACKGROUND

Hugging the east shore of Lake Koocanusa Reservoir in Montana's temperate northwest corner, the area encompassed by the Project measures 92,407 acres in size. The United States Forest Service ("Forest Service") manages 85% of the Project area, with the remaining acreage managed by other federal agencies as well as state and private interests. The Project area is "heavily roaded from past management activities," and "has also been heavily logged." (Doc. 1 at 7.)

The Project area is transected by five east-west flowing drainages: Fivemile Creek, Warland Creek, Cripple Horse Creek, Canyon Creek, and Dunn Creek. These drainages are deeply incised by their streams and the ridgelines have fairly gentle slopes. The drainage side slopes are generally steep. The Project area ranges in elevation from a low of about 2,200 feet along the Kootenai River to 6,051 feet atop Davis Mountain, the head of Fivemile Creek. The south and west aspects of the Project area have numerous small natural openings in the primarily ponderosa pine and Douglas fir canopy. The north and east aspects have a nearly

continuous canopy of Douglas fir, larch, and lodgepole pine. (FS 029267.[1])

Grizzly bear and Canada lynx, both threatened species under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, 1532(20), are present within the Project area. Moreover, the Project area contains 18,428 acres of the Tobacco Bears Outside the Recovery Zone ("BORZ") polygon, one of a number of similar zones developed by the Forest Service to analyze grizzly bear occurrence outside of established recovery zones. (FS 005803.). Approximately 30,463 acres of the total Project area also overlaps with the 55,789-acre Cripple Lynx Analysis Unit ("LAU"). (FS 005815, 005830.) Bull trout, a threatened fish species under the ESA, are present in Lake Koocanusa, but not present in the five, previously described creeks in the Project area. (FS 029281.)

The Project area provides a variety of recreational opportunities, and is very popular across a broad spectrum of users. Recreation activities are varied and occur year round. Activities include snowmobiling, hunting, fishing, off-highway vehicle use, hiking, scenic viewing, wildlife viewing, camping, and gathering of forest products such as berries and firewood. There are several major rock forms visible in the Project area, especially along Lake Koocanusa Reservoir, which are

---

1. Citations to the administrative record will consist of: (1) an "FS" prefix for the Forest Service portion of the record, or an "FWS" prefix for the United States Fish & Wildlife Service portion; and (2) the page number in the particular record.

popular with climbers. (*Id.*)

The Project area is relatively devoid of residential development other than scattered inholdings. There is a commercial resort and marina on the west side of the Project area where Cripple Horse Creek enters Lake Koocanusa. The southern third of the Project area is bisected by a high-voltage electrical transmission line located in an approximately 150 to 200 foot wide right-of-way. The transmission line disperses power generated at the Libby Dam to regional markets, including Kalispell, Whitefish, Libby, and communities surrounding Flathead Lake. There is a significant associated transformer facility located at the southwest corner of the Project area, within the Project area. Montana Highway 37 and Lake Koocanusa form the western boundary of the Project area.

The Project is the result of over four years of planning and input, and numerous groups and governmental units took part in shaping the final implementation plan. On October 27, 2014, Defendant Christopher Savage, Kootenai National Forest Supervisor, signed the Record of Decision ("ROD") announcing that the Forest Service would implement Alternative 2 from the Project Final Environmental Impact Statement ("FEIS"), with modifications.

The ROD describes the following vegetation management activities: (1) timber harvest and associated fuel treatment on approximately 8,845 acres

dispersed over the Project area, including intermediate harvest on approximately 5,387 acres and regeneration harvest on approximately 3,458 acres; (2) precommercial thinning on approximately 5,775 acres; (3) planting conifer seedlings on approximately 3,346 acres; (4) prescribed fire treatments on approximately 4,257 acres to reduce hazardous fuel loading; and (5) burning and/or slashing on approximately 10,049 acres to enhance wildlife habitat. (FS 029259–60.)

The ROD also describes the following road and access-related management activities: (1) maintenance to 176.4 miles of haul roads prior to and through the duration of timber harvesting activities; (2) construction of approximately 9.25 miles of new roads and 4.26 miles of temporary roads to accomplish harvest activities; (3) access changes from seasonal to year-long, open access on approximately 1.79 miles of road; (4) access changes from motorized to non-motorized on five trails totaling 27 miles; (5) watershed rehabilitation, including decommissioning 5.93 miles of road and storing approximately 16 miles of road; (6) adding approximately 13 miles of "undetermined" roads to the National Forest System Road System ("NFSRS"), while decommissioning another 6.24 miles of "undetermined" roads; and (7) creating a 2.75 mile non-motorized loop trail between Lake Koocanusa and Montana Highway 37 near the mouth of Cripple

Horse Creek. (FS 029260.)

Plaintiff filed its Complaint in this case on May 11, 2015, alleging the following five claims for relief: (1) the Project proposes a net increase in road density within the Tobacco BORZ, in violation of the Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones on the Kootenai, Lolo, and Idaho Panhandle National Forests ("Access Amendments"), and consequently will result in unpermitted take of grizzly bears; (2) regarding lynx, the Project fails to comply with the Northern Rockies Lynx Management Direction ("Lynx Amendment"), and in any event, the Forest Service cannot rely on the Lynx Amendment in the analysis of any project until reconsultation with the United States Fish & Wildlife Service ("Fish & Wildlife Service") has occurred; (3) the Forest Service erred both in concluding that the Project would have no effect on bull trout, and in failing to include bull trout in its biological assessment for the Project; (4) the Forest Service failed to conduct an analysis discussing the cumulative effects of past, present, and reasonably foreseeable amendments to the Kootenai National Forest Plan; and (5) the Forest Service's road density analysis is inadequate and misleading. (Doc. 1 at 22–30.) Plaintiff withdrew the fourth claim in its combined reply and response to Defendants' cross-motion for summary judgment. (Doc. 48 at 18.) The Court

held a hearing on the parties' cross-motions on April 19, 2016.

## LEGAL STANDARD

### I. Summary Judgment

A party is entitled to summary judgment if it can demonstrate that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248. "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether [an] agency could reasonably have found the facts as it did" based upon the "evidence in the administrative record." *City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (citations omitted).

### II. Administrative Procedure Act

Courts review claims regarding the ESA under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. *See Native Ecosystems Council v. Dombeck*, 304 F 3d 886, 891 (9th Cir. 2002). Under the APA, a "reviewing court

shall hold unlawful and set aside agency action . . . found to be . . . arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A). The Court's scope of review is narrow, and the Court

should "not substitute its judgment for that of the agency." *Motor Vehicle Mfrs.*

*Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A

decision is arbitrary and capricious:

> only if the agency relied on factors Congress did not
> intend it to consider, entirely failed to consider an
> important aspect of the problem, or offered an
> explanation that runs counter to the evidence before the
> agency or is so implausible that it could not be ascribed
> to a difference in view or the product of agency
> expertise.

*Gardner v. U.S. Bureau of Land Mgmt.*, 638 F3d 1217, 1224 (9th Cir. 2011). An

agency's actions are valid if it "considered the relevant factors and articulated a

rational connection between the facts found and the choices made." *Id.* (internal

quotation marks omitted). If the record supports the agency's decision, that

decision should be upheld even if the record could support alternative findings.

*Arkansas v. Oklahoma*, 503 U.S. 91, 112-113 (1992). Review of the agency's

action is "highly deferential, presuming the agency action to be valid."

*Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010).

However, this presumption does not require courts to "rubber stamp"

administrative decisions "they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth.*, 464 U.S. 89, 97 (1983) (internal quotation marks omitted). Judicial review under the APA is "narrow but searching and careful," and courts need not uphold agency actions where "there has been a clear error of judgment." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004) (citations and internal quotation marks omitted).

## ANALYSIS

## I. Applicable laws

### A. ESA

Section 7 of the ESA requires an agency to ensure that no discretionary action will "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.12(a). In evaluating compliance with the no-jeopardy requirement, an "agency shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). "Only after the [agency] complies with § 7(a)(2) can any activity that may affect the protected [species] go forward." *Pac. Rivers Council v. Thomas*, 30 F.3d 1050,

1055–57 (9th Cir. 1994).

The Forest Service's first step in complying with Section 7 is to obtain from the Fish & Wildlife Service "a list of any listed or proposed species or designated or proposed critical habitat that *may be present* in the action area." 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c)–(d) (emphasis added). If the Fish & Wildlife Service advises that a listed species or critical habitat may be present, the Forest Service must complete a biological assessment to determine if the proposed action "may affect" or is "likely to adversely affect" the listed species. 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.12 (f), 402.14(a), (b)(1); *Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006). Once the biological assessment is completed, it must be shared with the Fish & Wildlife Service. 50 C.F.R. § 402.12(j). "If [the Fish & Wildlife Service] advises that no listed species or critical habitat may be present, the [Forest Service] need not prepare a biological assessment and further consultation is not required." 50 C.F.R. § 402.12(d).

A determination by the Forest Service in a biological assessment that an action "may affect" a listed species or critical habitat gives rise to a consultation requirement under section 7 of the ESA. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012). Generally, "the minimum threshold for an agency action to trigger consultation with the [Fish &] Wildlife Service is low."

-10-

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 442, 496 (9th Cir. 2010).

"[A]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." *Id.* (citing 51 Fed. Reg. 19926, 19949 (June 3, 1986); *Cal. ex rel. Lockyer v. U.S. Dept. of Agric.*, 575 F.3d 999, 1018–19 (9th Cir. 2009)).

There are two forms of consultation: formal and informal. *Karuk Tribe of Cal.*, 681 F.3d at 1027. Formal consultation is necessary when the Forest Service has determined that an action is "likely to adversely affect" a listed species. *Id.* However, formal consultation is not required if: (1) the Forest Service finds, either in its biological assessment or through informal consultation, that while a project "may affect" a listed species, the species is "not likely to be adversely affected"; and (2) the Fish & Wildlife Service concurs in writing. 50 C.F.R. §§ 402.12(j)–(k), 402.14(b)(1), 402.13(a).

Section 9 of the ESA prohibits "take" of any listed species. 16 U.S.C. § 1538(a)(1)(B). "Take" includes "harassment" of a listed species by means of "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns." 16 U.S.C. § 1532(19); 50 C.F.R. § 17.3. If an agency action is likely to cause take but not jeopardize the species, the Fish & Wildlife Service

-11-

may issue an incidental take statement, which establishes the expected impact to the species, reasonable and prudent measures necessary to minimize take, and terms and conditions for implementing those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. 401.12(i). If an agency complies with the terms and conditions of an incidental take statement, it is exempt from ESA Section 9 liability. 50 C.F.R. § 402.14(i)(5).

## B. NEPA

"NEPA is a procedural statute that does not 'mandate particular results but simply provides the necessary process to insure that federal agencies take a hard look at the environmental consequences of their actions.'" *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639–40 (9th Cir. 2004) (internal citations omitted); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) (NEPA "prohibits uninformed—rather than unwise—agency action"). NEPA requires government agencies to "consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983). NEPA also requires that relevant information be made available to the public so that they "may also play a role in both the decision making process and the implementation of that decision." *Robertson*, 490 U.S. at 349.

An agency may comply with NEPA in one of three ways. The agency may prepare an EIS, prepare a less extensive EA and make a finding of no significant impact, or document that the proposed action falls within an established categorical exclusion. "NEPA requires the preparation of an EIS for 'major Federal actions significantly affecting the quality of the human environment.'" *Cascadia Wildlands v. Bureau of Indian Aff.*, 801 F.3d 1105, 1111 (9th Cir. 2015) (citing 42 U.S.C. § 4332(2)(C)).

While courts must "strictly interpret the procedural requirements in NEPA and the CEQ regulations," *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001), courts must "be mindful to defer to agency expertise, particularly with respect to scientific matters within the purview of the agency," *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004) (internal citations omitted.) "[T]he ultimate standard of review is a narrow one," and a court may not "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

## C. NFMA

NFMA requires National Forest planning at two levels: the forest level and the individual project level. 16 U.S.C. § 1604. At the forest level, NFMA directs the Department of Agriculture to "develop, maintain, and, as appropriate, revise

[forest plans] for units of the National Forest System." 16 U.S.C. § 1604(a). A
Forest Plan sets broad guidelines for forest management and serves as a
programmatic statement of intent to guide future site-specific decisions within a
forest unit. *Citizens for Better Forestry v. U.S. Dept of Agric.*, 341 F.3d 961, 966
(9th Cir. 2003); *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729
(1998). Forest Plans must "provide for multiple use and sustained yield of the
products and services" derived from the National Forests, including "outdoor
recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C.
§ 1604(e)(1).

At the individual project level, NFMA requires that each individual project
be consistent with the governing Forest Plan. *Great Old Broads for Wilderness v.
Kimbrell*, 709 F.3d 836, 851 (9th Cir. 2013).

The Forest Service's interpretation and implementation of its own Forest
Plan is entitled to substantial deference. *Siskiyou Reg'l Educ. Project v. U.S.
Forest Serv.*, 565 F.3d 545, 554–55 (9th Cir. 2009); *Forest Guardians v. U.S.
Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003).

## II. Plaintiff's claims

At the outset, the Court will address Defendants' contention that several of
the claims in the Complaint are waived due to Plaintiff's failure to raise the

-14-

particular issues in the administrative setting. While the Court recognizes the vital role of the administrative process when it comes to projects such as this and would hope that all stakeholders would meaningfully participate in the process, which hopefully will lead to efficient use of government resources, the Court will address the merits of Plaintiff's claims in this instance, where the waiver argument rests on the government's assessment of whether Plaintiff's comments during the decision-making process were specific and detailed enough. (*See e.g.* Doc. 33 at 13 ("While Plaintiff's voluminous comments may have addressed roads generally and included a complaint that the Access Amendments violate the law, . . . Plaintiff never articulated the specific concerns raised here").) If there is room for reasonable disagreement as to whether Plaintiff exhausted administrative remedies before filing its Complaint, then the Court prefers to address the merits of the substantive claims.

The Court will address Plaintiff's claims in the order in which they were presented in Plaintiff's opening brief. Ultimately, none of the claims warrant the relief Plaintiff requests, and Defendants are entitled to summary judgment in this case.

## A. Bull trout

Plaintiff contends that the Forest Service erred with respect to bull trout by:

(1) failing to include the species in the biological assessment for the Project, despite the alleged fact that bull trout "may be present" in the Project area; and (2) concluding that the Project would have "no effect" on bull trout. The Forest Service counters that, in the complete absence of evidence showing that bull trout exist within the Project area, it was neither arbitrary nor capricious to conclude that the Project would have no effect on bull trout. The record supports the Forest Service on this claim.

As to the first part of Plaintiff's claim, the Forest Service must include in its biological assessment for the Project only those threatened or endangered species identified by *the Fish & Wildlife Service* which "may be present in the area of such proposed action." 16 U.S.C. § 1536(c)(1). The record indicates that the Forest Service obtained a "current species list for the Kootenai National Forest" from the Fish & Wildlife Service on three separate occasions in 2012 and 2013, and that the Fish & Wildlife Service subsequently "concurred with potential listed species distribution maps and resulting consultation areas." (FS 005802.) The list did not include bull trout, and so the Forest Service did not include bull trout in the biological assessment for the Project. Thus, even assuming bull trout were erroneously omitted from the biological assessment, the error would lie with the Fish & Wildlife Service, not with the Forest Service. Plaintiff does not challenge

the species list provided by the Fish & Wildlife Service for the Project.

As to the second part of Plaintiff's claim, the Forest Service's conclusion that the Project will have no effect on bull trout can only be overturned if the Forest Service had "reason to believe that [bull trout] may be present in the area affected by [the] project and that implementation of [the Project] will likely affect [bull trout]." 16 U.S.C. § 1536(a)(3); *see also* 50 C.F.R. § 402.14(b)(1); *Karuk Tribe of Cal.*, 681 F.3d at 1027 ("An agency may avoid the [ESA's] consultation requirement only if it determines that its action will have 'no effect' on a listed species or critical habitat.") (citations omitted). As referenced above, the Fish & Wildlife Service did not indicate that bull trout were present in the Project area, and the agency's silence in this regard is expected given the evidence in the record. It is undisputed that bull trout exist in Lake Koocanusa, but electro-fishing records from creeks within the Project area indicate that no bull trout are found within them[2]—the five main creeks within the Project area simply lack the characteristic gradient, temperature, and streambed composition of bull trout habitat. (FS 029409–10.) Moreover, given the size of Lake Koocanusa and the sediment discharge into the reservoir as a result of the Project, the Forest Service's

---

2. At the motions hearing the parties agreed that the code "bt" in the electro-fishing data in the record (FS 002491–99), refers to non-native brook trout, not to bull trout as originally argued by Plaintiff in its brief.

-17-

conclusion that the Project would have no measurable effect on bull trout within

the larger body of water was reasonable. The Forest Service summarized its

findings with the respect to bull trout in the draft environment impact statement

("DEIS") as follows:

> Bull Trout are known from Lake Koocanusa. The fish in
> the reservoir are migratory and move into streams for
> spawning and rearing primarily in the Elk River, Canada.
> Fivemile Creek in the analysis area has mention of bull
> trout use which is anecdotal and from past professional
> judgment and [personal] communications. However,
> during numerous electrofishing surveys by Libby Ranger
> District personnel and [the Fish & Wildlife Service],
> only large numbers of brook trout (and a few rainbows)
> were found in the perennial segment of the stream. Any
> use of the drainage for spawning by bull trout would
> result in hybrid fish and the lack of actual evidence of
> bull trout in the drainage leads to the conclusion that bull
> trout do not use the drainage for spawning and rearing.
> An occasional fish may migrate into the system but
> conditions for bull trout in the drainage do not contain
> suitable habitat. Therefore, for this document, bull trout
> will not be considered present in tributary streams and
> not affected by the proposed project.

(FS 001297.) These conclusions are supported by the record and within the Forest

Service's discretion. Accordingly, Plaintiff's motion for summary judgment with

respect to this claim will be denied, and Defendants' motion will be granted.

## B. Grizzly bear

Plaintiff makes three interrelated arguments with respect to the grizzly bear.

-18-

First, Plaintiff alleges that the Project violates the Access Amendments because it results in a net increase of 4.15 linear miles of road within the Tobacco BORZ. Second, Plaintiff alleges that the Forest Service's failure to recognize this net increase renders erroneous its and the Fish & Wildlife Service's conclusion that the Project is not likely to adversely affect grizzly bear. Third, Plaintiff alleges that the unacknowledged increase in linear road miles will result in take beyond that permitted in the Access Amendments, pursuant to 16 U.S.C. § 1539(a)(1)(B). Defendants counter that Plaintiff's tiered argument rests on incorrect math, and that the Project in fact decreases linear road miles within the Tobacco BORZ by three-tenths of a mile. The Court agrees with Defendants that the Project does not result in the purported increase. Moreover, because this conclusion obviates Plaintiff's second and third sub-arguments, the Court will grant summary judgment in Defendants' favor on this claim.

Recognizing that "controlling and directing motorized access is one of the most important tools in achieving habitat effectiveness and managing grizzly bear recovery," and "that existing forest plans may not [have] provide[d] sufficient direction for the management of roads," the Forest Service developed the Access Amendments in 2011 in concert with the Interagency Grizzly Bear Committee. (FS 027704.) The Access Amendments modified the Kootenai National Forest

-19-

Plan, and thus influence the grizzly bear analysis associated with the Project.

The Access Amendments created the Tobacco BORZ and six other similar regions, measuring in size from 33,869 to 287,240 acres, for the purpose of monitoring areas outside designated recovery zones which nevertheless saw "recurring" grizzly bear use. (FS 027488.) The Access Amendments contained the following provision pertinent to the seven BORZ:

> The Forests shall ensure no increases in permanent linear miles of open road on National Forest System lands in any individual BORZ, above the baseline conditions identified in [the Access Amendments Biological Opinion] . . . . Potential increases in linear miles of open roads must be compensated for with in-kind reductions in linear miles of open road concurrently with, or prior to, project implementation within the same BORZ.

(FS 027486.) Baseline conditions for the Tobacco BORZ included 1,123.9 total linear miles of roads and 867.0 total linear miles of open roads "on National Forest System Lands." (FS 027488.)

Central to resolving Plaintiff's argument on this claim is the issue of whether the Access Amendments baseline conditions, as applied to the Project area, include so-called "undetermined" roads present in this part of the Kootenai National Forest. In the DEIS, the Forest Service noted that it had inventoried approximately 20 miles of undetermined roads in the Project area. (FS 001586–87.) Undetermined roads are those "for which the purpose and need was

undetermined," and which "cross [National Forest System] lands, but for various reasons, had never been included as a part of the [NFSRS]." (FS 001589.)

Given this definition and the language of the DEIS, Plaintiff claims that the Access Amendments baseline for the Tobacco BORZ did not account for undetermined roads, and that treating them as part of the baseline amounts to an end run around the prohibition on increasing linear road miles within a BORZ. Plaintiff contends that any undetermined roads slated to be included in the NFSRS as a result of the Project must therefore be counted as new roads. Thus, Plaintiff calculates a 4.15-mile increase in linear road miles within the Tobacco BORZ by adding 2.2 miles of newly constructed roads to 2.6 miles of undetermined roads to be included in the system, then subtracting .65 miles of system roads to be decommissioned.

Defendants counter that the Access Amendments baseline included undetermined roads in this area, and thus calculate a 0.3-mile decrease in linear road miles within the Tobacco BORZ by subtracting 2.5 miles of both system roads and undetermined roads planned for decommissioning from the 2.2 miles of new roads to be built pursuant to the Project. As to the 2.6 miles of undetermined roads to be added to the NFSRS, the Forest Service argues that the change in status does not render the undetermined roads "new" for accounting

purposes—the undetermined roads were already included in the baseline.

Though circumstantial, several pieces of evidence in the record support the conclusion that the baseline included the undetermined roads at the heart of the parties' discrepancy. First, as Defendant-Intervenors' counsel pointed out at the motions hearing, both the DEIS and FEIS describe undetermined roads within the Project area using road identification numbers. (*See e.g.* FS 001178–79; 029375.) This certainly suggests that the Forest Service was aware of these roads prior to cataloguing Project-related roads, and belies Plaintiff's contention that undetermined roads are "unauthorized" and "user-created." (Doc. 17 at 15.) Indeed, the Forest Service defines an "unauthorized road" as "a road . . . that is not a forest road . . . and that is not included in a forest transportation atlas." 36 C.F.R. § 212.1. The undetermined roads in the Project area are both "forest roads," that is, they are "wholly . . . within . . . and serving the National Forest System" and have been deemed "necessary for the protection, administration, and utilization of the National Forest System and the use and development of its resources," and "included in a forest transportation atlas," as evidenced by maps in the ROD. *Id.*

Second, and dovetailing with the notion that the Forest Service was aware of the presence of undetermined roads within the Project area and the Tobacco

BORZ, the Access Amendments describe baseline linear miles of roads occurring "on National Forest System Lands." (FS 027488.) This phrasing suggests that the baseline accounted for *all* roads on National Forest System lands within the seven BORZ, not just NFSRS roads.

Third, more than one source in the record references undetermined roads in a context which suggests that "undetermined" is an ownership or access-type status code. For example, the Project Travel Analysis Report contains a table listing the number of miles of existing roads of six different "management or ownership" categories within the Project area. (FS 008169.) The categories include "undetermined" roads, as well as roads administered by the Montana Department of Transportation, U.S. Army Corps of Engineers, Montana Department of Natural Resources Conservation, and private interests and companies. (*Id.*) Additionally, the DEIS lists the specific undetermined roads proposed to be added to the system through the Project, and lists the reasons why each road segment is significant. (FS 001168.) Once the roads are added, they will be assigned a system status code similar to roads already included in the system. The codes generally indicate the time of year during which access is permitted, and the type of access—motorized, non-motorized—permitted. (FS 001164–67.) These references in the Travel Analysis Report and DEIS indicate

that "undetermined" is likely a term of art or defined term in the universe of Forest Service transportation analysis, rather than a one-off means of describing scofflaw roads within this particular Project.

Ultimately, in light of the record evidence on this issue, the Court cannot say that the Forest Service's consideration of undetermined roads within the Tobacco BORZ is "plainly erroneous or inconsistent with the directive[s]" contained within the Kootenai National Forest Plan and the Access Amendments. *Siskiyou Reg'l Educ. Project*, 565 F.3d at 555. The circumstantial evidence is consistent and compelling. Thus, the Court finds that Plaintiff's contention regarding a net increase in linear road miles is without merit, and consequently will grant Defendants' motion for summary judgment on the entirety of this claim.

## C. Canada lynx

Similar to the grizzly bear analysis, Plaintiff's arguments with respect to lynx are threefold, though in this instance each argument stands on its own. First, Plaintiff contends that the Forest Service must reinitiate consultation with the Fish &Wildlife Service regarding lynx critical habitat before proceeding with *any* logging-related project within that habitat, thereby halting all projects until re-consultation occurs. Second, Plaintiff argues that the Forest Service's conclusion that the Project is "not likely to adversely affect" lynx is arbitrary and capricious.

Third, Plaintiff claims that the Forest Service has not complied with the ALL S1 habitat connectivity standard in the Lynx Amendment. The Court will address each basis in turn.

## 1. Reinitiating consultation before Project implementation

Plaintiff's argument with respect to reinitiating consultation stems from the Ninth Circuit's recent holding in *Cottonwood Environmental Law Center v. U.S. Forest Service*, 789 F.3d 1075 (9th Cir. 2015), which considered this Court's order in *Salix v. U.S. Forest Service*, 944 F. Supp. 2d 984 (D. Mont. 2013).

In *Salix*, this Court determined that the designation of critical habitat triggers the need for reinitiation of consultation under Section 7(a)(2) of the ESA, and that when the Fish & Wildlife Service designated lynx critical habitat in 2009, the Forest Service was required to reinitiate consultation on the Lynx Amendment. 944 F. Supp. 2d at 999–1000. Therefore, "[a] project affecting lynx or lynx critical habitat will be enjoined if its approval is contingent on an analysis that is 'inextricably intertwined and inescapable of separation' from a reliance on the standards set forth in the Lynx Amendment, because such project's approval is dependent on an underlying ESA violation." *Native Ecosystems Council v. Krueger*, 2014 WL 9954189, at *7 (D. Mont. June 4, 2014) (citing *Alliance for the Wild Rockies v. Krueger*, 950 F. Supp. 2d 1196, 1206–07 (D. Mont. 2013)

[hereinafter, *Alliance v. Krueger*]). Nevertheless, this Court has also held that "a project affecting lynx or lynx critical habitat may be appropriately and reasonably approved even if the [Forest Service's and Fish & Wildlife Service's] analysis mentions or relies in part on the Lynx Amendment, so long as the agencies' analysis also contains a reasonable independent basis for its conclusions with respect to effects on lynx and lynx critical habitat." *Id.* (citations omitted). "Agencies may show an independent basis for their conclusions regarding lynx critical habitat by demonstrating that 'the affected critical habitat will remain functional and that the primary constituent elements for critical habitat will not be altered to an extent that appreciably reduces the conservation value of the critical habitat, and neither the recovery nor the survival of the species will be jeopardized.'" *Id.* (citing *Alliance for the Wild Rockies v. Weber*, 2013 WL 5844447, at *15 (D. Mont. Oct. 30, 2013) [hereinafter, *Alliance v. Weber*]).

In *Cottonwood*, the Ninth Circuit reviewed this Court's determinations in *Salix* pertaining to the plaintiff's standing, whether the case was ripe, and whether the Fish & Wildlife Service's revised lynx critical habitat designation triggered the need for the Forest Service to reinitiate ESA consultation on the Lynx Amendment. 789 F.3d at 1077. On appeal, the government argued that the plaintiff lacked standing to challenge consultation on the Lynx Amendment

because it constituted a programmatic agency action without any direct, project-related injury to the plaintiff's individual members. *Id.* at 1079. Furthermore, the government argued that "because there was Section 7 consultation on [the] individual projects [at issue in the case] after the revised critical habitat designation, and because there was a determination that the projects would not have an adverse impact on lynx critical habitat, no injury resulted from the failure to reinitiate consultation on the Lynx Amendment[]." *Id.* at 1082. The court dismissed the government's *standing* arguments, noting that "even though individual projects may trigger additional Section 7 scrutiny, that scrutiny is dependent, in large part, on the Lynx Amendment[] and the 2007 [Biological Opinion] that were completed before critical habitat was designated on National Forest land," and that "project-specific consultations do not include a unit-wide analysis comparable in scope and scale to consultation at the programmatic level." *Id.*

Plaintiff seizes on this language as an indication by the Ninth Circuit that this Court's practice of accepting project-specific lynx critical habitat analyses if they stand independently from the Lynx Amendment is erroneous. For several reasons, the Court disagrees. First, the *Cottonwood* court's language regarding why a project-specific critical habitat analysis is insufficient is stated in the

abstract—the court did not squarely address this Court's rationale as to why such

an analysis might be sufficient, but instead indicated that, categorically, a project-

specific analysis does not eviscerate a plaintiff's Article III standing with respect

to programmatic challenges. Put another way, the court did not comment on the

merits of this Court's approach, but merely on why the government's standing

argument in that case failed. Second, the final line of Judge Pregerson's partial

dissent in *Cottonwood*—stating that he "would grant the Appellant's request for

an injunction [of the projects at issue] pending compliance with the ESA's Section

7 consultation requirements"—plainly indicates what the panel majority was *not*

saying in its opinion. 789 F.3d at 1095 (Pregerson, J., dissenting). If the majority

concluded that all projects should be enjoined pending the reinitiation of

consultation, a dramatic step indeed, then certainly there would have been no need

for Judge Pregerson to advocate for it in his dissent. Third, the government has

filed a petition for writ of certiorari with the United States Supreme Court with

regard to *Cottonwood*, which in turn led the Ninth Circuit to vacate submission of

*Alliance v. Krueger*—the first case in which this Court articulated the above-

described practice Plaintiff challenges here—on May 17, 2016. *See Alliance for

the Wild Rockies, et al. v. Christensen, et al.*, No. 14-35123, Doc. 50 (9th Cir. May

17, 2016). The Ninth Circuit will more squarely address this issue in its opinion in

-28-

*Alliance v. Krueger*, and the undersigned will await a more direct answer before abandoning what has now become the analytical framework in cases involving timber projects in lynx habitat.[3]

Based on the foregoing, the Court concludes that *Cottonwood* does not present a per se rule prohibiting timber projects from proceeding pending the Forest Service and Fish & Wildlife Service reinitiating consultation on the Lynx Amendment. Consequently, the Court will deny Plaintiff's motion for summary judgment on this point, and maintain its consistent approach on this issue.

## 2. "Not likely to adversely affect" determination

Plaintiff articulates a two-part argument regarding the determination of the Forest Service and the Fish & Wildlife Service that the Project is "not likely to adversely affect" the lynx[4]. First, Plaintiff contends that the agencies' determination is necessarily arbitrary and capricious because it relied too heavily on the Lynx Amendment—a point related to the discussion immediately above. Second, Plaintiff claims that the agencies' determination was arbitrary and

3. The approach is straightforward. If the lynx analysis relies solely on the Lynx Amendment, the case is remanded for further consultation. *See Salix v. U.S. Forest Service*, 944 F. Supp. 2d 984 (D. Mont. 2013); *Alliance v. Krueger*, 950 F. Supp. 2d 1196 (D. Mont. 2013).

4. The Court will not consider Plaintiff's argument that timber harvest necessarily adversely affects lynx. (*See* Doc. 17 at 27–28.) There is no question that the Forest Service is capable of tailoring projects such that timber harvest does not adversely impact wildlife—to hold otherwise would be to undercut, in part, the agency's statutory mandate.

capricious because the Project allegedly fragments and degrades mature and old growth forest, and because it will result in the "removal" of fourteen areas known to provide movement corridors for wildlife. (Doc. 17 at 28.) Defendants counter that the agencies' consulted as to the Project's effects upon the primary constituent element ("PCE") of lynx habitat, and so satisfied the *Alliance v. Krueger* "reasonable independent basis" standard. Defendants also counter that old growth and mature forest activities will not impact lynx critical habitat, and that none of the referenced movement corridors are actually identified linkage corridors. The record supports Defendants on these issues.

In its 2009 rule delineating lynx critical habitat in the United States, the Fish & Wildlife Service identified the lynx PCE as "boreal forest landscapes supporting a mosaic of differing successional forest stages, containing the following subelements: snowshoe hares and their preferred habitat, adequate winter snow conditions, denning habitat with abundant coarse woody debris, and 'matrix' habitat which facilitates lynx movement and dispersal and connects areas of suitable habitat." (FS 005813.) The Forest Service considered each one of the PCE sub-elements in table form in the biological assessment for the Project (FS 005819), and analyzed the PCE in significantly greater detail in the FEIS. (FS 029367–70.) Notably, as to the first and fourth sub-elements, the Forest Service

modified the Project so that "[m]ature multistory and young forests that provide

habitat conditions preferred by snowshoe hares [would not be] treated," and

confined treatment of matrix habitat to "the lower elevation boundary of the

LAU." (FS 029368, 029370.) Thus, with respect to the first part of Plaintiff's

claim here, the Forest Service has demonstrated that "the affected critical habitat

will remain functional and that the primary constituent elements for critical habitat

will not be altered to an extent that appreciably reduces the conservation value of

the critical habitat, and neither the recovery nor the survival of the species will be

jeopardized." *Alliance v. Weber*, 2013 WL 5844447, at *15.

The Forest Service has also demonstrated minimal Project effects upon old

growth and mature forest sections. As to old growth, the Forest Service stated the

following in the ROD:

> Concern regarding the impact to old growth stands is
> addressed by dropping proposed vegetation treatments in
> old growth. Alternative 2 with modifications maintains
> fuel treatments (173 acres) in some old growth such as
> on dry land types. The purpose of prescribed fire in old
> growth, as identified in the forest plan, is to maintain old
> growth characteristics. These proposed treatments will
> occur in dry land old growth such as south aspects of dry
> habitats. Treatments to be implemented are designed to
> reduce ladder fuels through a combination of slashing
> and prescribed burning. Reducing ladder and surface
> fuels will maintain or enhance some of the dry land old
> growth attributes and help ensure the survivability of the
> older, large diameter trees in these individual stands.

> The overall goal is to work towards returning these
> stands to their appropriate fire regime and increased fire
> resiliency.

(FS 029264.) While Plaintiff correctly cites Squires et al. (2010) for the

proposition that lynx prefer more mature stands during winter, the authors of that

study also noted that lynx in Montana "selected mature, multistoried forests . . .

composed of mixed conifers that included lodgepole pine, Douglas-fir, and

western larch, but predominately consisted of Englemann spruce and subalpine fir

in the overstory and midstory." (FS 029091.) This preference is consistent with a

wetter, higher elevation mixed stand, and thus the old growth treatments proposed

with the Project—prescribed fire in south-aspect dryland types—will not affect

preferred lynx winter habitat.

Moreover, as to Plaintiff's contention that "the Project allows for

clearcutting of 1,269 acres of mature boreal forest," the Forest Service concluded

in the biological assessment that the acreage consisted of "general mature, stem-

exclusion habitat within the LAU which may serve in the same capacity as

'matrix' habitat," but that "[d]ue to the scattered and random nature of the

proposed treatment units and that only 1,269 acres (4.2%) out of 30,463 LAU

acres would be treated, effects to the juxtaposition of boreal and matrix habitat

would be minimal[5]." (FS 005819.) The Forest Service only proposed to include these stands in the treatment acreage because, upon field verification, it became clear that the areas were not of a multi-story or stand initiation character. (FS 005815.) Contrary to the suggestion that the Forest Service intends to harvest a nearly 1,300 acre swath of mature forest, the record indicates that the agency carefully considered whether to treat these forest sections, and decided to do so only after determining—with the concurrence of the Fish & Wildlife Service—that the section did not square with the PCE.

Finally, as to Plaintiff's claim that the Project will remove wildlife movement corridors, the record is clear that "[t]here are no identified linkage corridors . . . in the [Project area] *or* potentially impacted LAUs *or* adjacent LAUs" (FS 005815 (emphasis added)), and nevertheless, as discussed below, the Project complies with the Lynx Amendment ALL S1 connectivity standard.

Based on the foregoing, the Forest Service and Fish & Wildlife Service reasonably determined that the Project was "not likely to adversely affect" the lynx. *See* 50 C.F.R. § 402.13; *Conservation Congress v. Finley*, 774 F.3d 611, 615 (9th Cir. 2014). The Court will deny Plaintiff's motion for summary judgment and grant Defendants' motion on this ground.

---

5. Not only are the proposed clearcut units scattered, but four of the seven units overlap with the powerline right-of-way in the southern third of the Project area. (FS 029356.)

### 3. Compliance with the Lynx Amendment's ALL S1 standard

Plaintiff's final lynx-related claim—that the Project fails to comply with the

Lynx Amendment's ALL S1 habitat connectivity standard—is essentially

answered by the Court's analysis regarding the agencies' "not likely to adversely

affect" determination. The record demonstrates that the amount and distribution

of treatment activities in lynx habitat does not run afoul of the standard's mandate.

The Lynx Amendment accounts for lynx habitat connectivity through the

ALL S1 standard. The standard requires that any "[n]ew or expanded permanent

development and vegetation management projects must *maintain* habitat

connectivity in an LAU and/or linkage area." (FWS 001072 (emphasis added).)

To "maintain" according to the Lynx Amendment "means to provide enough lynx

habitat to conserve lynx . . . [i]t does not mean to keep the status quo." (FWS

001083.) The Lynx Amendment further defines "habitat connectivity" as

"consist[ing] of an adequate amount of vegetative cover arranged in a way that

allows lynx to move around." (FWS 001082.) Connectivity may be provided by

"[n]arrow forested mountain ridges or shrub-steppe plateaus," as well as by

"wooded riparian areas . . . across open valley floors." (*Id.*)

Simply stated, the Project will leave more than enough lynx habitat intact

following harvest activities to both conserve lynx and permit lynx to move

through the area. (*See* FS 001604; 001612–13.) Because there are no linkage areas within the Project area or immediately surrounding it (FS 001497), the question here is whether connectivity is maintained within the Cripple LAU. The Fish & Wildlife Service confirmed as much through informal consultation (FWS 000004), and the record makes clear that the Forest Service engaged in a unit-by-unit lynx habitat analysis during preparation of the DEIS. (FS 005955–56.) Because the Forest Service complied with the Lynx Amendment's ALL S1 standard, the Court will grant Defendants' motion for summary judgment on this issue.

## D. Wildlife security, roads, and trails

Finally, Plaintiff contends that the Forest Service's analysis with respect to trail and road closures, and the agency's subsequent representation regarding increased wildlife security, is misleading and in violation of NEPA. Specifically, Plaintiff argues that the Forest Service: (1) misrepresented the total linear miles of trails slated for closure, because the particular trails at issue had been closed through previous timber sale projects; (2) improperly concluded that adding undetermined roads to the NFSRS would not result in increased road density; and (3) failed to disclose the fact that it planned to re-categorize approximately 27 miles of "decommissioned" roads to "intermittent stored service" roads.

Defendants counter that the decision documents adequately disclosed the Forest Service's treatment of these issues, and so the agency complied with NEPA. The Court agrees with Defendants on these issues.

As to the first sub-argument, Plaintiff cites a record document entitled "TRAILS OPEN TO MOTORIZED WITHIN THE CRIPPLE PSU" to support its contention that much of the trail system in the Project area, which the Forest Service now claims to be closing to motorized use, has been closed for years via previous timber projects. (FS 000617–23 [hereinafter, "motorized trail summary"].) The Project will leave open 9.5 miles of the total 36.5 miles of motorized trails in the Project area for purposes of developing the Boundary Mountain Loop Trial. (FS 029261.) The remaining 27 miles will be re-designated "non-motorized." (*Id.*) The motorized trail summary discusses all of the trail segments in the Project area, and appears to indicate that previous project environmental assessments and decision notices had analyzed the segments as non-motorized. (FS 000620–23.) Plaintiff thus argues that leaving open a 9.5 mile motorized trail is actually akin to adding the trail—since the Forest Service had previously considered all 36.5 miles of trail non-motorized—and that the Forest Service's failure to explain this situation constitutes a NEPA violation. The Court disagrees. The fact that previous project analyses concluded, to the extent

they even did so, that the trails should have been closed to motorized use earlier does not render insufficient the Forest Service's indication in the Project DEIS that the trails will be closed to motorized use *now* and going forward. The bottom line is that somehow the trail segments were never officially closed to motorized access, the Forest Service discovered the error and concluded that they should be restricted to non-motorized access, and ultimately indicated as much in the DEIS and Project Travel Analysis Report. (FS 001591; 008176.)

As to the second sub-argument, the Court's earlier analysis regarding undetermined roads in the Tobacco BORZ answers the question of whether the Forest Service failed to disclose an increase in road density Project-wide—the Court has found that undetermined roads were part of the Project baseline road density, which means that including undetermined roads now does not increase density. Moreover, Plaintiff's contention that the Forest Service failed to define "undetermined road" is without merit. The DEIS clearly described what undetermined roads are, why they are proposed for addition to the NFSRS, and the benefits of doing so. (FS 001589; 001591.)

Finally, as to the third sub-argument, Plaintiff's contention that the Forest Service failed to disclose its re-categorization of 27 miles of Project-area roads from "decommissioned" to "intermittent stored service" appears to be unfounded.

While record documents show that Forest Service transportation personnel discovered the classification error and acknowledged that re-categorizing the roads would result in increased road density in the Project area, the Forest Service noted that "[s]ince one . . . objective[] is to reduce road density, the list of roads proposed for storage in the [Project] will be looked at . . . and will be considered for decommissioning (instead of storage) so there will be no net increase in total road densities." (FS 028271.) Moreover, the Project Travel Analysis Report, repeatedly referenced in the DEIS (*See, e.g.*, FS 001589–90), accounts for and discloses the numerous road segments in the Project area "incorrectly in [the Forest Service database] as [d]ecommissioned, should be [intermittent stored service]." (FS 008179–84.) In short, and similar to the motorized trails sub-argument above, the Forest Service discovered and corrected an inventory mistake, and sufficiently disclosed the outcome in the DEIS.

Based on the foregoing, the Court will deny Plaintiff's motion for summary judgment with respect to trail and road disclosures, and will grant Defendants' motion.

## CONCLUSION

The East Reservoir Project represents one of the larger forest resource management projects to be considered by this Court, and the record reflects that

the Forest Service and Fish & Wildlife Service engaged in a review of potential impacts commensurate with the Project's scope. Plaintiff's challenges to the agencies' analyses and conclusions with respect to bull trout, grizzly bear, lynx, and transportation infrastructure do not warrant the relief Plaintiff requests, and, accordingly,

IT IS ORDERED that:

(1) Plaintiff's motion for summary judgment (Doc. 16) is DENIED.

(1) Defendants' motion for summary judgment (Doc. 32) is GRANTED.

(2) Defendant-Intervenors' motion for summary judgment (Doc. 39) is GRANTED.

(4) The Clerk of Court shall enter judgment in favor of Defendants and CLOSE this case.

DATED this 19th day of July, 2016.

Dana L. Christensen, Chief Judge
United States District Court